ACKER v. UNITED STATES (No. 103).

1. COUNTRY OF ACTUAL EXPORTATION.
   Champagne produced in France, exported from that country to Great Britain without a then existing intent on the part of either party to the transaction to export from France to the United States, followed by storage of the goods, assumed to be in a bonded warehouse in London, and by the owner there subsequently sold to importers in the United States to fill an order, the compliance with which did not specify or require champagne produced in France, and without any intent on the part of the importer in this country to import from France here, is not an importation from France to the United States under the provisions of the reciprocity agreement concluded between that country and this January 28, 1908.

2. EX PARTE AFFIDAVITS.
   It seems that an *ex parte* affidavit taken abroad for the purpose of introducing the same before the Board of General Appraisers may not be competent evidence before this court.

United States Court of Customs Appeals, April 3, 1911.

TRANSFERRED from United States Circuit Court for Southern District of New York, Abstract 20749 (T. D. 29597).

[Affirmed.]

B. A. Levett for appellants.
D. Frank Lloyd, Assistant Attorney General (Charles E. McNabb on the brief), for the United States.

Before MONTGOMERY, HUNT, SMITH, BARBER, and DE VRIES, Judges.

BARBER, Judge, delivered the opinion of the court:
The appellant on or about September 11, 1907, imported at New York certain champagne in bottles which was duly entered for warehousing. After February 1, 1908, it was withdrawn for consumption. On January 28, 1908, a reciprocity agreement between the United States and France was concluded and by the President promulgated, by his proclamation of that date, setting forth the same. (T. D. 28721.) Under paragraph 295 of the tariff act of 1897 the duty imposed on said champagne imported in bottles, containing more than a pint and not more than a quart, was $8 per dozen, and when in bottles containing not more than 1 pint and more than one-half pint, $4 per dozen. This importation being contained in bottles of the above sizes, the collector assessed duty thereon accordingly and his action was sustained by the Board of General Appraisers.

The importer contends that the duty should have been assessed at the rate of $6 instead of $8 per dozen on the quart bottles of champagne and $3 per dozen instead of $4 for the above-mentioned smaller size by virtue of the above-named reciprocity agreement and the act authorizing it. The material portions of section 3 of the tariff act of

[1] Reported in T. D. 31481 (20 Treas. Dec., 669).

1897, by virtue of which the reciprocity agreement was concluded, are as follows:

That for the purpose of equalizing the trade of the United States with foreign countries, and their colonies, producing and exporting to this country the following articles: * * * the President be, and he is hereby, authorized, as soon as may be after the passage of this act, and from time to time thereafter, to enter into negotiations with the governments of those countries exporting to the United States the above-mentioned articles, or any of them, with the view to the arrangement of commercial agreements in which reciprocal and equivalent concessions may be secured in favor of the products and manufactures of the United States; and whenever the government of any country or colony, producing and exporting to the United States the above-mentioned articles, or any of them, shall enter into a commercial agreement with the United States, or make concessions in favor of the products, or manufactures thereof, which, in the judgment of the President, shall be reciprocal and equivalent, he shall be, and he is hereby, authorized and empowered to suspend, during the time of such agreement or concession, by proclamation to that effect, the imposition and collection of the duties mentioned in this act on such article or articles so exported to the United States from such country or colony, and thereupon and thereafter the duties levied, collected, and paid upon such article or articles shall be as follows. * * *

There is no real question but that the champagne was produced in France. The board found that it was shipped from London to the appellant, having been purchased by them of G. F. Grant & Co., of that city. They also found that the champagne was shipped from France to London and placed in a bonded warehouse by the vendor of the appellant. It does not appear when the shipment from France to London was made.

It is conceded that the only question in the case is whether the champagne was exported from France to this country, and that if so, the merchandise was dutiable as claimed by the appellant.

It is familiar law that the burden is upon the appellant to maintain its claim. It appears from the appellant's evidence that it purchased the goods from G. F. Grant & Co. in London and that at the time the order was given there was no understanding between appellant and its vendor that the champagne ordered should be procured from France or that the order should be filled with champagne that had been produced in France. In other words, champagne was ordered of said Grant & Co. in London and they were to fill the order without regard to the country of its production. The appellant does not appear to have had any intention or desire to import from France, and it does not appear when the knowledge that it had made or might make the claim to have made such an importation was first brought home to it. It does not appear from whom the champagne was first purchased in France, neither does it appear that at the time the champagne was sent from France to England it was intended or designed by the then vendor or vendee that it should be exported from France to the United States or from England to the United States.

It is claimed by appellant that the fact that the champagne was kept in a bonded warehouse in London prevented it from entering into the commerce of Great Britain, and it is said that the sending of the merchandise from France to London and then from London to New York is merely a transshipment at London, and that such transshipment was but one step in the entire act of exportation from France to this country.

The act under which the reciprocity agreement was negotiated provides that such agreement may be made with countries producing and exporting to this country articles which are the authorized subjects of the agreement and that the agreement when negotiated shall reduce the rates of duty on the articles so exported to the United States as in the act provided. If it can be said that the shipment to London from France, under the circumstances, was but one step in the entire act of exportation from France to the United States it could with equal force be urged that the purchaser of the champagne in London could have sold it to another purchaser, a resident of some other country, and so in like manner it might have been sold and shipped from port to port, from one country to another, so long as vendors and vendees pleased, and if finally it was imported into the United States it could be said that the various exportations and importations and changes of ownership were each a successive step in the entire act of exportation from France to the United States.

We do not think such a conclusion would be sound.

The intent with which an act is done is many times conclusive of the effect of the act. There is nothing in the record which shows that the intent of Grant & Co. in purchasing the champagne in France and shipping it to London was different than what would ordinarily therefrom be presumed, namely, that it was their intent to import the champagne to England. The fact that it was placed in a bonded warehouse does not change the natural presumption which otherwise obtains because the placing the same in such warehouse is not inconsistent with an importation to England; the importers had the right to place the same in their own warehouse or in a bonded warehouse at their own election and any subsequently acquired intent on the part of Grant & Co., if any there were, and none is shown by the record, of treating the original exportation from France to London as one step in an importation to the United States could not change the effect of the first importation to England.

It may be observed that the fact that the champagne remained in bond in London until shipped to this country is based upon an *ex parte* affidavit which was received in evidence by the board over the objection of counsel for the United States, whose objection was

that the affidavit was *ex parte* and that no opportunity for cross-examination had been afforded. This objection has not been waived. Our attention has not been called to any statute, decision, or rule of procedure which renders such an affidavit admissible over such an objection, and if the facts stated in the affidavit were the basis of any finding by which the appellant's contention could be sustained we should, unless statute or authority to the contrary exists, undoubtedly feel constrained to say that there was not competent evidence to support such finding.

The statement in the affidavit that "none of said champagne entered into the commerce of Great Britain" we construe to mean that in fact the same had not been bought and sold there. Obviously the affiant's conclusion that as matter of law it had not reached that condition, if he intended to so state, is without probative force.

Assuming, however, that it is proven by legitimate evidence that the champagne was kept in bond in London, we do not think the conclusion to be reached can be thereby affected.

In Gibson *v*. Stevens (49 U. S. [8 How.], 383) it was held that the title to merchandise the subject of commerce was transferable by the indorsement and delivery of the bill of lading when the merchandise was in the custody of the warehouseman, and it was said that such was the law of England and of this country, and that it was "absolutely necessary for the purposes of commerce."

It can make no difference whether the goods are in bonded warehouse or in a warehouse not bonded.

Applying the doctrine of that case to the facts here, assuming the affidavit to be competent evidence of facts therein set forth, it appears that this merchandise, although in a bonded warehouse, entered in one sense at least into the commerce of Great Britain. Especially must this be true when there is no evidence that at the time this champagne was placed in the bonded warehouse there was any intent on the part of Grant & Co. to export the same to the United States. So, in that view, it is immaterial whether the merchandise was in a bonded warehouse in London or was elsewhere in England in the possession of Grant & Co. It was in either event subject to bargain and sale there.

It is claimed by appellant that there is nothing in the reciprocity agreement or the act authorizing it that in terms provides for a direct shipment from France to the United States or that precludes a transshipment in the course of the transmission from France here.

With this we agree, and we do not mean to decide that in proper cases transshipment may not be had in the course of exportation from France to the United States. We do, however, hold that when the merchandise leaves France there must exist an intent to export

it from that country to this; that it must be then destined for the United States and intended to enter into and become a part of the merchandise of this country; and it follows that any transshipment in the course of its passage from France here that is consistent with such preexisting intent would be permissible.

As before pointed out, this case is barren of such conditions. The merchandise was first exported from France to England, and while it was in the latter country the intent first arose to export it to the United States, which intent was carried to execution. The cham-. pagne was, therefore, imported to this country from Great Britain and not from France, and the judgment of the Board of General Appraisers is *affirmed*.

MONTGOMERY, Presiding Judge, and HUNT, SMITH, and DE VRIES, Judges, concur.