(C. D. 380)

D. & B. Import Corp. *v.* United States

United States Customs Court, Third Division

(Decided October 9, 1940)

*Barnes, Richardson & Colburn* (*J. Bradley Colburn* of counsel) for the plaintiff. *Charles D. Lawrence,* Acting Assistant Attorney General (*Charles J. Miville* and *Daniel G. McGrath,* special attorneys), for the defendant.

Before Cline, Evans, and Keefe, Judges; Evans, J., not participating

Cline, Judge: This is a suit against the United States in which the plaintiff seeks to recover a part of the duties assessed by the collector of customs at the port of New York on Bacardi rum. The merchandise was imported from Bermuda on February 28, 1934, and entered for warehouse. In the liquidation of the entry the collector assessed duty thereon at $5 per gallon under paragraph 802 of the Tariff Act of 1930 plus $2 per gallon under the Liquor Taxing Act of 1934. Part of the importation was exported without entering the commerce of the United States and no duty was assessed thereon, part was withdrawn from warehouse for consumption in the United States prior to September 3, 1934, and the balance was withdrawn subsequent to September 3, 1934.

The only claims presented to the court for decision are that the rum withdrawn from warehouse prior to September 3, 1934, is subject to duty at $5 per gallon under paragraph 802 of the Tariff Act of 1930 less a deduction of 20 per centum from the $5 assessment by virtue of the Convention of Commercial Reciprocity between the United States and the Republic of Cuba of 1902 and section 316 of the Tariff Act of 1930, and that the rum withdrawn from warehouse subsequent to September 3, 1934, is dutiable at $2.50 per gallon, instead of $5 per gallon, by virtue of the trade agreement between the United States and the Republic of Cuba entered into on August 24, 1934, published in T. D. 47232.

The protest contains further claims with respect to the assessment of $2 per gallon on the merchandise under the Liquor Taxing Act of 1934, but the claims against such assessment were not pressed at the trial.

The facts of the case are contained in a stipulation, entered into between the parties, marked "Exhibit 1." The rum was manufactured or produced in the Republic of Cuba by Compania Ron Bacardi S. A. Santiago de Cuba. In June 1932 the rum was sold by Compania Ron Bacardi to Chartier & Co. at St. Georges, Bermuda. Upon arrival at St. Georges, Bermuda, the rum was placed in customs bonded warehouses by Chartier & Co. and remained in continuous customs custody at that port without being changed in form or condition. In February 1934 the rum was sold by Chartier & Co. to D. & B. Import Corporation, the plaintiff herein, and was shipped out of customs custody in Bermuda by Chartier & Co. to D. & B. Import Corporation of New York. Upon arrival at New York the merchandise was entered for warehouse by the plantiff under warehouse bond entries 57218, of May 15, 1934, and 59826 of June 14, 1934. The quantities of rum withdrawn for consumption in the United States and the dates of each withdrawal are set forth in schedule A of the stipulation, Exhibit 1.

The only question for decision is whether the sale of the rum to a firm in Bermuda and its diversion to Bermuda deprived it of its status as merchandise entitled to the benefit of preferential treatment under the Cuban treaty of 1902 and the Cuban Trade Agreement of 1934.

With respect to the claim as to the merchandise withdrawn from warehouse prior to September 3, 1934, when the Cuban Trade Agreement of 1934 became effective, the plaintiff alleges that the only requirement for invoking the provisions of the treaty of 1902 between the United States and the Republic of Cuba, providing for preferential rates of duty on Cuban products, is that the merchandise shall be the product of the soil or industry of Cuba and that neither the treaty itself nor the act of Congress (33 Stat., part 1, page 3),

directing that the treaty be made effective, specifies that the Cuban products must be imported directly from Cuba in order to secure the benefits of the preferential rates of duty thereunder.

· The Commercial Convention of 1902 between the United States and Cuba, ratified with amendments by the United States Senate on March 19, 1903, was made effective on December 27, 1903, by a proclamation of the President, dated December 17, 1903. (33 Stat., part 2, page 2136). The provision in the treaty upon which plaintiff relies reads as follows:

ARTICLE II.

During the term of this convention, all articles of merchandise not included in the foregoing Article I and being the product of the soil or industry of the Republic of Cuba imported into the United States shall be admitted at a reduction of twenty per centum of the rates of duty thereon as provided by the Tariff Act of the United States approved July 24, 1897, or as may be provided by any tariff law of the United States subsequently enacted.

In the case of *Cellas, Inc.* v. *United States*, 68 Treas. Dec. 357, T. D. 47915, it was held that the provisions of the treaty of 1902 between the United States and Cuba were not applicable to imports from Italy, even though there existed a treaty between the United States and Italy containing a most-favored-nation clause providing that any favor granted to other nations in respect to commerce shall immediately become common to Italy.

The plaintiff cites T. D. 25209, which is a letter addressed by the Assistant Secretary of the Treasury to the collector of customs at the port of New York, dated April 18, 1904, soon after the effective date of the Cuban Reciprocity Treaty, relating to evidence required in order to entitle Cuban merchandise to the reduction in duty under the Cuban treaty, when such merchandise had been exported from Cuba to other countries and then exported from such other country to the United States. The Assistant Secretary directed that such merchandise was entitled to the reduction in duty provided in the treaty when the merchandise had remained in bonded warehouses in the country of exportation before shipment to the United States. The importer was required to furnish the following evidence and documents with the entry:

In addition to the regular consular invoice covering the goods, the Department will require as evidence of identification a certificate from the customs authorities at the port of shipment to the United States, and to which the merchandise was shipped from Cuba, specifically describing the merchandise by marks and numbers, stating the name of the vessel and the date of arrival thereof at said port, and the place from which the merchandise was originally shipped; also that the merchandise had been in the continuous custody of said customs authorities from the time of arrival or importation until the date of shipment to the United States without payment of duties, and that the goods, as well as the marks and numbers thereof, had not been interfered with in any manner while in said custody. The

certificate should further state that the goods were withdrawn from said custody for exportation to the United States and the name of the vessel in which the merchandise was exported.   *   *   *

Substantially the same requirements. are prescribed in article 634 of the Customs Regulations of 1915 and article 770 of the Customs Regulations of 1923.  This practice seems to have been in force until November 7, 1929, when article 770 of the Customs Regulations of 1923 was amended in T. D. 43658, which is a letter addressed by the Secretary of the Treasury to the collector of customs at the port of New York.  In that letter attention is directed to a decision of the Board of General Appraisers in 1914 (*O. G. Hempstead & Son* v. *United States*, 26 Treas. Dec. 130, T. D. 34125) and to a statement in the proclamation of the President in which the provisions of the Cuban treaty were proclaimed (33 Stat., part 2, page 2136, T. D. 24836), after which the Secretary made the following statement:

For the reasons stated in the foregoing the department is of the opinion that when Cuban products are sold to foreign countries and the seller has lost title and interest in the products, such products upon being subsequently shipped to the United States would not be entitled to the 20 per centum deduction whether such products had been placed in a bonded warehouse in a foreign country or not.  Accordingly, the department is of the opinion that in the case referred to in the second paragraph of this letter the sugar would not be entitled to the 20 per centum deduction.

A different situation would be presented if Cuban sugar was shown either by the invoice or bill of lading to be destined to the United States by way of a foreign country even though the sugar was transshipped in a foreign port.  Such a shipment would, in the opinion of the department, entitle the sugar to the 20 per centum deduction.  You will be governed accordingly.

Article 770 of the Customs Regulations, insofar as it is in conflict with the foregoing, will be amended.

Article 848 of the Customs Regulations of 1931 conforms with the ruling in T. D. 43658 above quoted.

The part of the opinion in *O. G. Hempstead & Son* v. *United States, supra,* digested in the Secretary's decision, reads as follows:

*   *   *   While the language of the treaty does not expressly provide that to be entitled to the 20 per centum reduction the merchandise shall arrive in this country by direct shipment, or even that it should be imported from Cuba, we think the entire purpose of the treaty would be defeated if Cuban products that had been exported to other countries, and had become a part of the commerce of other countries, and were then from those countries exported to this country should receive the benefit of that treaty.  The treaty was intended to extend a tariff privilege to the Republic of Cuba, this privilege to be extended upon considerations expressly stated in the treaty.  When the citizens of that Republic had ceased to be interested in its products by having exported them to another country, the purpose of the treaty would not be served by allowing the 20 per centum reduction when they were brought here from that other country.  *   *   *

Apparently this excerpt does not relate to merchandise which was placed in a bonded warehouse upon being exported from Cuba to a

foreign country. The court's decision seems to rest upon the premise that it was not shown in the record that the merchandise had been placed in a bonded warehouse, for the court said "we must overrule the protest for the reason that the record in no way shows that the cigars had not mingled with the commerce of England before being imported to this country." The Secretary quoted the following language used in the President's proclamation:

WHEREAS a Convention between the United States of America and the Republic of Cuba to facilitate their commercial intercourse by improving the conditions of trade between the two countries, was concluded and signed by their respective plenipotentiaries at the City of Havana on the eleventh day of December, 1902, the original of which Convention, being in the English and Spanish languages, is, as amended by the Senate of the United States, word for word as follows:   * * *.

Counsel for the defendant draws our attention to the words "to facilitate their commercial intercourse by improving the conditions of trade between the two countries" in the proclamation of the President above quoted. The same language appears in the first paragraph of the treaty. That language furnishes an indication that the purpose of the treaty entered into between the two countries was to improve the conditions of trade between the United States and Cuba. The Secretary quoted that part of the proclamation in his decision and those words may have influenced him in deciding that the former practice was wrong. In *Lloyd* v. *United States*, 9 Ct. Cust. Appls. 280, T. D. 38217, the court held that the fact that the collector had for 20 years followed a wrong practice was not conclusive.

The invoices covering the goods in this case and the statements in Exhibit 1 indicate that the commercial transaction was between a party in Bermuda and a party in the United States and there is nothing to indicate that the Cuban exporter ever intended that the merchandise should finally result in an importation into the United States by transshipment at Bermuda. How would the commercial intercourse between the United States and Cuba be benefited or facilitated by a reduction in the rate of duty on this merchandise? A reduction in duty would seem to improve the conditions of trade between Bermuda and the United States rather than between Cuba and the United States.

An act of Congress, approved December 17, 1903 (33 Stat., part 1, page 3), entitled "An Act to carry into effect a convention between the United States and the Republic of Cuba, signed on the eleventh day of December, in the year nineteen hundred and two" contains the following provision:

The rates of duty herein granted by the United States to the Republic of Cuba are and shall continue during the term of said convention preferential in respect to all like imports from other countries.

This particular portion of the statute has reference to the preferential rates of duty granted "by the United States to the Republic

of Cuba" and it clearly manifests an intent to extend the preferential rates of duty to imports from Cuba as distinguished from "imports from other countries."

The plaintiff cites *United States* v. *United Cigar Stores Co.*, 1 Ct. Cust. Appls. 450, T. D. 31505. That case related to a shipment of cigars which were produced in the Philippine Islands. Congress provided in section 5 of the Tariff Act of 1909 that cigars, the product of the Philippines, not in excess of a quantity amounting to 150,000,000 per year, were to be admitted into the United States free of duty, but this free admission was "conditioned upon the direct shipment thereof from the country of origin to the country of destination." The invoice covering the cigars of the shipment was made out in the Philippine Islands and the destination given on the invoice was the United States, but the shipment went by way of Hong Kong where it was transferred from one vessel to another before finally being deposited on a vessel destined for the United States. The court held that the shipment was a direct shipment within the provisions of the law. The plaintiff urges that since the provisions of the law relating to direct shipments from the Philippines was construed to cover a transhipment in another country and the Cuban treaty contains no limitation as to the character of the shipments, the provisions of the treaty should be considered broader than the law relating to Philippine shipments so as to cover any kind of a shipment of merchandise the product of the soil or industry of Cuba which had not mingled with the goods of another country. In our opinion this analogy of the conditions of the two cases is not persuasive that Congress and the parties to the Cuban treaty intended that the provisions of the treaty should apply to merchandise which had been released from the control of the residents or dealers in Cuba before it was sold and shipped to the United States by residents or merchants of Bermuda. The treaty and the law may not specify that the merchandise covered thereby shall be shipped either directly from Cuba to the United States or shipped from Cuba destined for the United States through a transshipment in another country, but a construction of the language of the treaty and the statute supports the theory that no other class of shipments was intended to be covered thereby.

The case of *Acker* v. *United States*, 1 Ct. Cust. Appls. 404, T. D. 31481, cited by the defendant, contains facts similar to those in the case here under consideration. In that case champagne, the product of France, was sold to G. F. Grant & Co. of London, England, where it was placed in bonded warehouse. Subsequently, G. F. Grant & Co. sold the champagne to the importer Acker in the United States and the merchandise was shipped to this country and placed in bonded warehouse here. France and the United States entered into a reciprocity treaty which was proclaimed by the President (T. D. 28721).

It appears therefrom that the tariff rates on champagne and other sparkling wines, "being the products of the soil and industry of France," were to be admitted into the United States at less than the regular tariff rates on such products. Acker withdrew the champagne from warehouse after the reciprocity treaty became effective and claimed that duty should be assessed at the rates provided in the treaty. There was one phase of that case that is different from the instant case. The statute (section 3 of the Tariff Act of 1897) authorizes the President to enter into reciprocity treaties with countries "producing and exporting to this country." The court held that the intent of the parties should be considered and that in order that the treaty rates of duty be available to the United States importer it must appear that the French exporter intended that the shipment was destined for the United States when he exported it from France. In overruling the importer's claim, the court said:

It is claimed by appellant that there is nothing in the reciprocity agreement or the act authorizing it that in terms provides for a direct shipment from France to the United States or that precludes a transshipment in the course of the transmission from France here.

With this we agree, and we do not mean to decide that in proper cases transshipment may not be had in the course of exportation from France to the United States. We do, however, hold that when the merchandise leaves France there must exist an intent to export it from that country to this; that it must be then destined for the United States and intended to enter into and become a part of the merchandise of this country; and it follows that any transshipment in the course of its passage from France here that is consistent with such preexisting intent would be permissible.

As before pointed out, this case is barren of such conditions. The merchandise was first exported from France to England, and while it was in the latter country the intent first arose to export it to the United States, which intent was carried to execution. The champagne was, therefore, imported to this country from Great Britain and not from France, and the judgment of the Board of General Appraisers is *affirmed*.

Counsel for the plaintiff distinguishes *Acker* v. *United States, supra,* from the case here under consideration by the fact that the reciprocity treaty with France was concluded under the provisions of section 3 of the Tariff Act of 1897 which limits the authority of the President to enter into reciprocity treaties with foreign countries with respect to products "produced in and exported from" foreign countries, citing *E. La Montagne & Son* v. *United States,* 2 Treas. Dec. 355, T. D. 21565; *Fishel, Adler & Schwartz* v. *United States,* 4 Treas. Dec. 822, T. D. 23315; *The Florida Brewing Company* v. *United States,* 5 Treas. Dec. 43, T. D. 23473a; *A. Morello* v. *United States,* 7 Treas. Dec. 148, T. D. 24971, in which decisions that phase of the case was specially commented upon. While the Convention of Commercial Reciprocity between the United States and Cuba of 1902 or the act of Congress

making that treaty effective does not contain the words "produced in and exported from Cuba," the principles announced by the court in the *Acker* decision above quoted are as applicable to the case now before the court as they were in the *Acker* case.

The decision in *United States* v. *American Sugar Refining Co.*, 202 U. S. 563, T. D. 27410, while relating to the time when the Cuban Reciprocity Treaty of 1902 became effective, contains an expression of opinion as to the character of the importations covered by the treaty. The court said:

It is true, as urged by appellant, that the act of December 17 deals entirely with importations from Cuba, * * *.

The portion of the merchandise shown in Exhibit 1 to have been withdrawn from warehouse subsequent to September 3, 1934, is claimed by the plaintiff to be dutiable at $2.50 per gallon under schedule II of the trade agreement with Cuba entered into on the 24th day of August 1934, published in T. D. 47232, which agreement became effective 10 days thereafter. Authority to make reciprocal trade agreements was vested in the President by section 350 (a) of the Tariff Act of 1930, which is an amendment to the tariff act approved on June 12, 1934 (48 Stat., part 1, page 943, T. D. 47117). The portion of the amendment which authorized special privileges to Cuba is section (2) (b), reading as follows:

Nothing in this section shall be construed to prevent the application, with respect to rates of duty established under this section pursuant to agreements with countries other than Cuba, of the provisions of the treaty of commercial reciprocity concluded between the United States and the Republic of Cuba on December 11, 1902, or to preclude giving effect to an exclusive agreement with Cuba concluded under this section, modifying the existing preferential customs treatment of any article the growth, produce, or manufacture of Cuba: *Provided*, That the duties payable on such an article shall in no case be increased or decreased by more than 50 per centum of the duties now payable thereon.

In our opinion the convention of 1902 between the United States and Cuba related to imports of Cuban products from Cuba as distinguished from Cuban products imported from another country. It is noted that section (2) (b), above quoted, seems to establish that the commercial policy of the treaty of 1902 shall not be violated by any trade agreement entered into under the authority of section 350 (a).

There are portions of the trade agreement which seem to show that it was intended to apply to *commerce* between Cuba and the United States and to *exports* from one country to the other. For instance, in the preamble, the following appears:

The President of the United States of America and the President of the Republic of Cuba, *desirous of strengthening the traditional bonds of friendship and commerce between their respective countries* by maintaining as the basis for their commercial relations the granting of reciprocal preferential treatment, in con-

tinuation of the policy adopted in the Convention of Commercial Reciprocity of 1902 between the two countries, and taking into consideration that changed conditions have rendered it necessary to modify the provisions of that Convention, have arrived at the following Agreement: [Italics ours.]

A portion of article V reads as follows:

With respect to the allotment of quotas by the United States of America or the Republic of Cuba for any article on which quantitative restrictions are not prohibited by this Agreement, there shall be no discrimination against any person or company *importing or exporting such articles between the two countries.* [Italics ours.]

Article XIII reads in part as follows:

No administrative ruling by the United States of America or the Republic of Cuba effecting advances in duties or charges applicable under an established and uniform practice to *imports from the territory of the other country* shall be effective retroactively or with respect to articles either entered for or withdrawn for consumption prior to the expiration of thirty days after the date of publication of notice of such ruling in the usual official manner. [Italics ours.]

The portion of the agreement which plaintiff claims is applicable is schedule II which provides in paragraph 802 for a duty on rum the product of Cuba at $2.50 per gallon. The following excerpt from article III relates to that schedule:

No article the growth, produce, or manufacture of the Republic of Cuba, enumerated and described in Schedule II annexed hereto, with respect to which a rate of duty is specified in Column 2 of the said Schedule, shall in any case, except as provided in Article VIII or X, be subject to any customs duty in excess of the rate so specified.

The plaintiff claims that this provision is a prohibition against the assessment of duty on rum produced in Cuba at rates higher than $2.50 per gallon, but we are of opinion that, in order to ascertain the intent of the parties, the whole agreement should be considered.

In the case of *R. J. Prentiss & Co., Inc.* v. *United States*, 1 Cust. Ct. 219, C. D. 49, affirmed on appeal in *Louis Wolf & Co. et al.* v. *United States*, 27 C. C. P. A. 188, C. A. D. 84, the question before the court was as to whether the same agreement involved in the instant case was an exclusive agreement with Cuba. In its opinion holding that no other country was entitled to the benefits of the agreement the trial court said:

The language must be construed as a whole and it would have a self-contradictory effect if the plaintiff's construction viewing it piecemeal should prevail.

The italicized portions of the excerpts from the preamble and from articles V and XIII, above quoted, furnish adequate proof of an intent to aid the *commerce* between the United States and Cuba. The preamble, at least, must be accepted as indicating the purpose of the whole trade agreement. The granting of the preferential rates of duty to the rum herein involved would tend to aid the commerce between Bermuda and the United States which is not within the

contemplation of the trade agreement with Cuba. We are of opinion that the meaning of article III and schedule II should be determined in conjunction with the other provisions so as to make the application of the agreement harmonize throughout.

The plaintiff contends that the provisions of the trade agreement must be construed in a broad and liberal spirit and, when two constructions are possible, one restrictive of the rights that may be claimed under them and the other favorable to them, the more liberal one should be adopted, citing *Askura* v. *Seattle*, 265 U. S. 332; *Hauenstein* v. *Lynham*, 100 U. S. 483; *Factor* v. *Laubenheimer*, 290 U. S. 276. We have examined the decisions cited and find that they contain substantially the same statements that are found in the point raised by the plaintiff, but the question involved in those cases related to the application of State laws in connection with the terms of treaties with foreign countries. In *Factor* v. *Laubenheimer, supra,* Mr. Justice Stone made the following statement in his opinion:

> Considerations which should govern the diplomatic relations between nations and the good faith of treaties, as well, require that their obligations should be liberally construed so as to effect the apparent intention of the parties to secure equality and reciprocity between them. For that reason if a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred.

It is obvious from this excerpt that the intention of the parties is of paramount importance, and, as we have mentioned before, the preamble to the trade agreement with Cuba signifies that the purpose of the document was to aid commerce between the United States and Cuba, and the other excerpts which we have quoted tend to show that imports from one country to the other were the sole subject of consideration. The importations in this case do not meet those specifications.

The plaintiff argues further that the conditions of both the Cuban treaty and the trade agreement are similar to the law relating to the marking of country of origin set forth in section 304 of the Tariff Act of 1930 and that since it has been held that merchandise produced in one country but exported to the United States from another should be marked with the name of the country in which it was produced, the rum in this case should be held to be within the provisions of the treaty and trade agreement with Cuba because it was produced in that country, citing *Friedlaender & Co., Inc.* v. *United States*, 2 Cust. Ct. 406, C. D. 166; *Closset & Devers* v. *United States*, Abstract 37655; *Reichenbach & Co., Inc.* v. *United States*, Abstract 39532. It is argued by the defendant that those cases are not in point because the marking statute expressly states that imported goods must be marked so as to indicate the country of origin so that the ultimate purchaser will know in what country it was produced, whereas the Cuban treaty and

trade agreement cover only merchandise which is both produced in Cuba and exported to the United States from that country. In passing on this point it is sufficient to point out that the decision in *Friedlaender & Co., Inc.* v. *United States, supra,* was reversed by the appellate court in *United States* v. *Friedlaender & Co. Inc.,* 27 C. C. P. A. 297, C. A. D. 104, wherein the court held that, as shown by the syllabus,

The term "country of origin" as used in section 304, *supra,* as amended, should not * * * be so restricted as to limit the operation of the statute to the *situs* of the merchandise at the instant of its creation. Its origin, so far as it relates to American commerce, began when it started on its journey to the United States.

It cannot be successfully contended that the merchandise in this case did not enter the commerce of Bermuda upon the sole ground that it was held in that country in a bonded warehouse. There is an abundance of authority holding that merchandise in a bonded warehouse in a foreign country must be considered as having entered the commerce of that country when it could have been withdrawn at any time for consumption there. *Moore Dry Goods Co.* v. *United States,* 11 Ct. Cust. Appls. 449, T. D. 39531; *Geo. W. Booth* v. *United States,* 3 Treas. Dec. 585, T. D. 22338; *United States* v. *G. W. Sheldon,* 53 Treas. Dec. 34, T. D. 42541. It is not shown by the evidence in this case that the merchandise was destined for the United States when it was exported from Cuba and we must consider that the exportation in this case was from Bermuda.

Our attention has been directed to a number of decisions of the appellate court where it was claimed that the Cuban Trade Agreement should be applied in assessing duty on merchandise the product of the soil or industry of countries other than Cuba. *F. H. Von Damm* v. *United States,* 25 C. C. P. A. 97, T. D. 49094; *E. & J. Burke, Ltd.* v. *United States,* 26 C. C. P. A. 374, C. A. D. 44; *Louis Wolf & Co. et al.* v. *United States,* 27 C. C. P. A. 188, C. A. D. 84. Those cases did not involve the particular issue raised herein but the following statement in *E. & J. Burke, Ltd.* v. *United States, supra,* seems to indicate that the court was of opinion that the trade agreement applies only to exportations and importations of goods between Cuba and the United States:

* * * Schedule I establishes exactly the same kind of preferentials with respect to goods entering Cuba from the United States as does schedule II for goods *entering the United States from Cuba.* Both schedules provide for minimum percentage preferential reductions and maximum rates. Article II of the agreement relates to schedule I, and article III relates to schedule II. Both articles are identical, with the exception that the names of the respective countries are transposed, article II dealing with imports from the United States into Cuba, and article III with *imports from Cuba into the United States.* [Italics ours.]

Since the commercial transaction under which the merchandise herein involved became an importation into the United States was

between a firm in Bermuda and a firm in the United States, we hold that, even though the rum was produced in Cuba, the importation is not subject to the provisions of the Cuban Convention of Commercial Reciprocity of 1902 or the trade agreement of August 24, 1934. The protest is overruled. Judgment will be entered in favor of the defendant.