**DESSY ENTERPRISES, Inc.,**

v.

**UNITED STATES.**

**C. D. 1993; Protest Nos. 243900–K, etc.**

United States Customs Court,
First Division.

May 15, 1958.

Oliver, Chief Judge, dissented.

Stein & Shostak, Los Angeles, Cal. (Marjorie M. Shostak and Richard M. Kozinn, Los Angeles, Cal., of counsel), for plaintiff.

George Cochran Doub, Asst. Atty. Gen. (Joseph E. Weil, New York City and Murray Sklaroff, Trial Attys.), for defendant.

Before OLIVER, Chief Judge, and MOLLISON, and WILSON, Judges.

MOLLISON, Judge.

The plaintiff in this case imported into the United States a shipment of glassware, wall plates, decorated china tableware, etc., and made entry of the same under the appropriate paragraphs of the Tariff Act of 1930, to wit, paragraphs 212 and 218, 19 U.S.C.A. § 1001, pars. 212, 218, at reduced rates, effective by virtue of Presidential proclamations relating to the General Agreement on Tariffs and Trade, T.D. 51802.

In reporting upon his examination and appraisement of the merchandise, pursuant to section 500(a) (4) and (5) of the Tariff Act of 1930, 19 U.S.C.A. § 1500(a) (4, 5), the appraiser noted on the summary sheet that higher rates than those at which the merchandise had been entered applied, and made the fol-

lowing notation on the invoice: "All china and glassware of East German or Czecho origin unless otherwise noted— T.D. 52788—52837."

Acting upon this advice, the collector of customs classified the merchandise under the paragraphs claimed upon entry, but assessed duty thereon at the full rates provided by the Tariff Act of 1930, as originally enacted. In so doing, the collector was apparently acting under the authority of the Treasury decisions cited by the appraiser, which are Presidential proclamations issued pursuant to section 5 of the Trade Agreements Extension Act of 1951, 65 Stat. 72, 19 U.S.C.A. § 1362, 86 Treas. Dec. 277, T.D. 52772, which reads as follows:

"Sec. 5. As soon as practicable, the President shall take such action as is necessary to suspend, withdraw or prevent the application of any reduction in any rate of duty, or binding of any existing customs or excise treatment, or other concession contained in any trade agreement entered into under authority of section 350 of the Tariff Act of 1930, as amended and extended, to imports from the Union of Soviet Socialist Republics and to imports from any nation or area dominated or controlled by the foreign government or foreign organization controlling the world Communist movement."

Under date of August 1, 1951, the President of the United States issued a proclamation (reported in 86 Treas. Dec. 300, T.D. 52788) providing, in part, as follows:

"That the application of reduced rates of duty * * * established pursuant to trade agreements heretofore or hereafter entered into * * * shall be suspended with respect to imports from such nations and areas referred to in section 5 as may be specified in any notification pursuant to this part of this proclamation given by the President to the Secretary of the Treasury * * *. For the purposes of this part the term 'imports from such nations and areas' shall mean articles imported directly or indirectly into the United States from nations or areas specified in an effective notification, but shall not in any case include articles the growth, produce, or manufacture of any other nation or area." 19 U.S.C.A. § 1362 note.

On the same date, the President notified the Secretary of the Treasury that the suspension provided for by his proclamation was applicable with respect to imports from the Soviet Zone of Germany and the Soviet Sector of Berlin (T. D. 52788, supra), and, on October 2, 1951, a similar notification included Czechoslovakia (T.D. 52837).

By its protests herein, the plaintiff claims the benefit of the reduced rates under the appropriate trade agreement provisions, claiming that the merchandise was neither of East German or Czechoslovakian origin nor imported directly or indirectly from such nations or areas.

In support of such claim, the plaintiff has offered evidence which it contends establishes that the merchandise at bar was entitled to the benefit of the reduced rates under any or all of several bases: First, that the merchandise was the manufacture of nations or areas not dominated or controlled by the communist organization, and, second, that the merchandise was a direct importation from the Western Zone of Germany and not an indirect importation from the Eastern Zone of Germany or of Czechoslovakia.

The first contention, i. e., that the merchandise was the manufacture of nations or areas not under communist domination or control, has two facets, (a) that the merchandise was the manufacture of areas now in the Western Zone of Germany, and (b) that, if manufactured in areas now in the Eastern Zone of Germany or in Czechoslovakia, such manufacture took place at a period of time before such nations or areas came under communist domination or control. This latter circumstance, it is contended, removes the merchandise from both the letter and intent of the statute and proclamation, which, it is contended, refer

only to merchandise the growth, produce, or manufacture of nations or areas since those nations or areas came under communist domination or control.

The same statute and proclamation which are here involved were brought under judicial scrutiny in the recently decided case of United States v. Hercules Antiques, Danwill Company, 44 C.C.P.A., Customs, 209, C.A.D. 662. In that case, however, the majority of our appellate court determined that, because of the paucity of the record evidence, there was no substantial evidence sufficient to overcome the presumption of correctness attaching to the action of the collector.

In so doing, however, the majority of our appellate court made certain observations, which will be referred to, infra, but it should be emphasized that the record evidence in the present case is quite different from that in the Hercules Antiques case, and, in many respects, supplies as to the merchandise at bar the deficiencies of proof noted by the majority of our appellate court in connection with the evidence offered in that case.

■ An analysis of the statute and proclamation under which the collector acted shows that the provisions thereof apply *only* to merchandise which—

(1) is the growth, produce, or manufacture of nations or areas under communist domination or control, *and*

(2) is imported directly or indirectly therefrom.

If *either* of these factors is lacking, the provisions of the statute and proclamation do not apply, and the merchandise is entitled to the benefit of the reduced rates of duty.

We think it should be noted that the subject matter of this case consists of chinaware and glassware of a type used over a period of many years in European homes. None of it is in the realm of rare or truly antique pieces, nor does any of it qualify as works of art. It appears to be of a common, everyday nature, and we can recognize that such ware does not ordinarily bear, or have accompanying it, any authentic indicia of its origin or of its age, nor any means by which, with the application of common knowledge, these matters can be determined.

The point of the foregoing is that by reason of the very nature of the articles involved the possibility of securing direct evidence as to their origin or age is nonexistent, and the best evidence that the situation affords is the opinion of persons who, by reason of study, practice, and observation, have acquired a special knowledge of the subject matter.

The record in the case at bar consists largely of the oral testimony of Charles Dessy, president of the plaintiff corporation, who was present in the Western Sector of Berlin, Germany, and purchased all of the articles here involved after personal inspection of the same. Mr. Dessy's vocation, and, it appears, his avocation, related to European glassware and chinaware of the kind here involved, and his background, study, and experience qualify him to express his opinion on the subject.

■ Based upon his experience in the trade and upon his personal knowledge of such ware, Mr. Dessy testified that, in his opinion, the newest piece of merchandise contained in the involved importation was made between 1905 and 1910. While effort was made on the part of the defendant to disprove this fact, at least with respect to certain of the pieces involved, and to attack the qualifications of Mr. Dessy so to testify, we are of the opinion that Mr. Dessy's statement was not impaired thereby and constitutes evidence sufficient to satisfy the court that the fact was in accordance with his stated opinion.

■ We may take judicial notice of the fact that, at the time mentioned, 1905 to 1910, there were no nations or areas of the world which were under communist domination or control of the type referred to in the statute, from which it follows that the merchandise at bar was not the manufacture of any nation or area *which at the time of its manufacture* was under communist domination or control.

The question thus posed is whether the proscription of section 5 of the Trade Agreements Extension Act of 1951 and of the applicable portions of the Presidential proclamation relating thereto applies only to imported merchandise which was the growth, produce, or manufacture of communist dominated or controlled nations or areas *since such nations or areas became so dominated or controlled,* or whether it applies as well to merchandise which was grown, produced, or manufactured in those nations or areas before they became communist dominated or controlled.

The statute and proclamation require the tariff status of imported merchandise to be determined by the political complexion of the nation or area of growth, produce, or manufacture, and of the nation or area from whence imported. They are ambiguous in that they do not indicate the result intended in the situation which has arisen here, where, even assuming without deciding that the merchandise was the manufacture of East Germany or Czechoslovakia, it clearly appears that such manufacture took place before those nations or areas acquired their present political status. Recourse to such of the legislative history of the provisions as is available to the court fails to resolve the ambiguity.

■ We are of the opinion that where, as here, a law imposing a tariff duty is susceptible of two interpretations, one favorable to the taxpayer and one against, there should be applied the well-settled rule expressed in the opinion of the Supreme Court in the case of American Net and Twine Company v. Worthington, 141 U.S. 468, at page 474, 12 S.Ct. 55, at page 57, 35 L.Ed. 821, 824. The rule was expressed as follows:

"We think the intention of congress that these goods should be classified as 'gilling twine' is plain; but, were the question one of doubt, we should still feel obliged to resolve that doubt in favor of the importer, since the intention of congress to impose a higher duty should be expressed in clear and unambiguous language. United States v. Isham, 17 Wall. 496 [84 U.S. 496, 21 L.Ed. 728]; Hartranft v. Wiegmann, 121 U.S. 609, 7 S.Ct. 1240, [30 L.Ed. 1012]; Gurr v. Scudds, 11 Exch. 190."

■■ Under such an interpretation the merchandise at bar was not the growth, produce, or manufacture of nations or areas under communist domination or control and, hence, is not subject to the statute and proclamations under which the collector acted.

Moreover, we are satisfied that the record establishes that the decision of the collector that the merchandise was "imported directly or indirectly" from communist dominated or controlled nations or areas was erroneous and/or invalid.

In the Hercules Antiques case, supra, our appellate court pointed out that the term "imported directly" relates to merchandise, originally destined for the United States, which was shipped without deviation to the United States, or as to which, if deviated through an intermediate country or countries, such deviation amounted only to mere passage through or transshipment in the intermediate country or countries.

There is no serious dispute that the merchandise at bar was not "imported directly" from a communist dominated or controlled nation or area. The record evidence shows that the merchandise was purchased by Mr. Dessy after examining the same in the shop of a West German dealer. Its presence in West German territory was, therefore, something more than mere passage through or transshipment in that territory while enroute to the United States. It follows that the merchandise could not have been "imported directly" from a communist dominated or controlled nation or area.

Consequently, aside from considerations as to origin which have been disposed of hereinbefore, if the merchandise is at all liable to the higher rates of duty imposed by reason of the statute and proclamation, it must be on the basis that it was "imported * * * indirect-

ly" from communist dominated or controlled nations or areas. It is, therefore, in order to examine the implications of the term "imported * * * indirectly."

In the case of Loblaw Groceterias, Inc., v. United States, 22 C.C.P.A., Customs, 479, T.D. 47481, our appellate court had occasion to consider the import of the phrase "imported either directly or indirectly" as used in paragraph 369 of the Tariff Act of 1922, 42 Stat. 885. That paragraph contained the following proviso:

"* * * That if any country, dependency, province, or other subdivision of government imposes a duty on any article specified in this paragraph, when imported from the United States, in excess of the duty herein provided, there shall be imposed upon such article, when imported either directly or indirectly from such country, dependency, province, or other subdivision of government, a duty equal to that imposed by such country, dependency, province, or other subdivision of government on such article imported from the United States, but in no case shall such duty exceed 50 per centum ad valorem."

In the cited case, one of the questions at issue was whether certain automobile chassis, originally made in England and which had been sent to Canada and from there shipped to the United States, had been "imported either directly or indirectly" from England. This court had held that the chassis were imported "indirectly" from England. In reversing that decision, our appellate court said:

"* * * We are, however, unable to agree with this conclusion. For one thing, there is an entire absence of any showing in the record that there was ever any intent, when the goods left England, that they should ultimately enter the United States. * * *"

■ See, also, Acker v. United States, 1 Ct.Cust.App. 404, T.D. 31481; Booth v United States, 3 Treas. Dec. 585, T.

D. 22338; and United States v. G. W. Sheldon & Co., 53 Treas. Dec. 34, T.D. 42541, all to the effect that, to constitute an "import from" a foreign country within the meaning of the tariff statutes, there must exist an intention that the goods ultimately enter the United States, i. e., be destined for the United States at the time of original shipment.

Indeed, so ingrained is this principle in the law that appropriate customs regulations have for many years existed to carry it into effect. The regulation in force and effect at the time of importation of the present merchandise was section 14.3(d) of the Customs Regulations of 1943 and read as follows:

"14.3 Appraisement of merchandise; determination of value. * *

* * * * * *

"(d) Merchandise imported from one country, being the growth, production, or manufacture of another country, shall be appraised at its value in the principal markets of the country from which it is immediately imported unless it appears by the invoice, bill of lading, or other evidence that the merchandise was destined for the United States at the time of original shipment, in which case it shall be appraised at its value in the principal markets of the country from which it was originally exported."

■ The appraiser returned the value of the merchandise at bar in West German marks. In so doing, he must be presumed to have acted in accordance with the requirements of section 14.3(d), supra. There is, consequently, implicit in his return of value a finding that there was no evidence "that the merchandise was destined for the United States at the time of original shipment." Inasmuch as it is a *sine qua non* of importation "directly or indirectly" from a given country that the merchandise be destined for the United States at the time of original shipment therefrom, the only presumption arising from the appraiser's action is that the

merchandise was not imported either directly or indirectly from any country other than the country of immediate importation, to wit, West Germany.

There is no doubt that the entered and appraised values represent the values of the merchandise in the principal markets of West Germany, the country from whence the merchandise was immediately imported. The appraiser is the officer who examines and inspects the merchandise, and, by virtue of section 501 of the Tariff Act of 1930, as amended, title 19, U.S.C.A. § 1501, "The decision of the appraiser, including all determinations entering into the same, shall be final and conclusive upon all parties unless a written appeal for a reappraisement is filed with or mailed to the United States Customs Court by the collector within sixty days after the date of the appraiser's report, or filed by the consignee or his agent with the collector within thirty days," etc.

■ Neither the collector nor the importer filed an appeal for a reappraisement, so that upon the expiration of the limited time the appraisement, including all determinations entering into the same, became final and conclusive and binding upon the collector as well as upon the importer. 19 U.S.C.A. §§ 1501, 1503. Eurasia Import Co., Inc., v. United States, 31 C.C.P.A., Customs, 144, C.A.D. 265; L. Heller & Son, Inc., v. United States, 20 C.C.P.A., Customs, 257, T.D. 46058.

■ It would, therefore, follow that, not having taken an appeal from the appraiser's return of value in West German marks, i. e., at its value in the principal markets of the country of immediate exportation, the collector was precluded from assessing duty on the merchandise as though it had been imported directly or indirectly from East Germany and Czechoslovakia. His liquidation and assessment on that basis are, consequently, demonstrated to have been erroneous, because contrary to a binding conclusive presumption of fact, or invalid, because not made in accordance with the law, and

in either case is not clothed with the presumption of correctness ordinarily attaching to his official actions.

■ It is, of course, well-settled law that a plaintiff in bringing an action in this court against the decision or classification of a collector assumes the twofold burden of establishing that the collector's decision or classification was erroneous and that the classification he seeks is the correct one or that the relief he seeks is the proper action to be taken under the circumstances. In some cases, however, and the present case is an example, the very establishment of the error or invalidity of the collector's action also establishes the propriety or correctness of the relief sought.

Thus, the presumption of correctness attaching to the appraiser's determination, conclusive in the absence of appeal, operates to establish the correctness of the plaintiff's claim.

We have heretofore adverted to the fact that the record in the case at bar is considerably different from that which was made in the case of United States v. Hercules Antiques, Danwill Company, 44 C.C.P.A., Customs, 209 C.A.D. 662, decided in favor of the Government, and to which its counsel has referred in the brief filed in its behalf in this case.

In the cited case, the collector's decision included a finding that the merchandise had been produced in Czechoslovakia, a communist-dominated country. The merchandise had been immediately imported from Holland, and it appears that there was no serious attempt made on the part of the importer to show that the merchandise had not been produced in Czechoslovakia. Consequently, the issue turned, as pointed out by our appellate court, on the question of whether the merchandise had been imported directly from Holland, or indirectly from Czechoslovakia.

In assuming its burden of proof, plaintiff, in that case, relied upon evidence consisting of the invoices and related papers and the testimony of a witness who was not present in Holland when the

merchandise was purchased and had no firsthand knowledge as to where the merchandise came from. Such evidence, our appellate court held, was insufficient to overcome the presumption of correctness of the collector's finding that the merchandise was imported directly or indirectly from Czechoslovakia.

In the case at bar, however, besides the evidence available from the invoice and related papers, the regularity of which have not been questioned, we have the testimony of a witness who was personally present in West Berlin when the merchandise was purchased, who personally examined each piece, who made such personal inquiry as might be made by a reasonable and prudent businessman as to where the merchandise came from, and who, moreover, had more than the common knowledge of the average layman as to the age and place of production of such merchandise. On the record facts, therefore, we are of the opinion that the decision in the Hercules Antiques case, supra, does not control the determination of the present case.

During the course of its opinion in the Hercules Antiques case, supra, the majority of our appellate court considered the nature and background of the statute and proclamation here involved, and said:

> " * * * It is evident, however, both from the language of the proclamation itself and from the legislative history of the statute on which it is based, that it was the intention of Congress and the President to withhold from Communist-dominated countries the benefits of rates of duty reduced by trade agreements. At the very least, the language used was intended as a red light to indicate to the appropriate officials that merchandise originating in Communist-dominated countries should be examined with great care before it could be accepted as an import from any other country.

> * * * * * *

> " * * * in view of the evident objective of the Presidential proclamation, and its broad reference to 'articles imported directly or indirectly' from Communist-dominated nations, it seems clear that the proclamation looks to the substance rather than the manner of importation, and that its purpose is to deny reduced rates of duty to all imports which are so closely related to a Communist-dominated nation that such nation may derive benefit from the reduction in duty."

With these statements as to the purpose and intent of the statute and proclamation there can be no disagreement, but it is possible to discern that in the application of the broad principles expressed above to the assessment of duty upon imported merchandise erroneous and illegal interpretations might arise. Thus, if the phrase in the Presidential proclamation "imported directly or indirectly into the United States" were construed as granting to the collector and other customs officials a wide, sweeping, and unfettered discretionary power, it would permit said officials to classify merchandise, part of the mass of goods and commerce of a noncommunist country, as though it were the merchandise and part of the mass goods and commerce of a communist-dominated country, and thereby without restriction and without sufficiently definite standards withdraw the benefit of reduced rates provided for in the trade agreements. Construed in such fashion the Presidential proclamation would be rendered vague, indefinite, and uncertain in its application to imports and importation from noncommunist nations and areas. Construed as a grant of so large an amount of discretionary power to the collector and customs officials the Presidential proclamation would be rendered *ultra vires*, illegal, and invalid (Carl Zeiss, Inc., v. United States, 76 F.2d 412, 23 C.C.P.A., Customs, 7, T.D. 47654; Hampton, Jr., & Co. v. United States, 14 Ct.Cust.App. 350, 369, T.D. 42030, affirmed in J. W. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 409, 48 S.Ct. 348, 72 L.Ed. 624; William A. Foster & Co., Inc., v. United States, 20 C.C.P.A., Customs,

955

15, 22–25, T.D. 45673; Norwegian Nitrogen Products Co. v. United States, 20 C.C.P.A., Customs, 27, 34, 35, T.D. 45674; United States v. Fox River Butter Co., 20 C.C.P.A., Customs, 38, 45, T.D. 45675. See, also, Little v. Barreme, 2 Cranch. 170, 2 L.Ed. 243; Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 587, 588, 72 S.Ct. 863, 96 L.Ed. 1153; Cole v. Young, 351 U.S. 536, 557, 76 S.Ct. 861, 100 L.Ed. 1396; United States v. Guy W. Capps, Inc., 4 Cir., 204 F.2d 655, 658, 659, affirmed on other grounds in 348 U.S. 296, 75 S.Ct. 326, 99 L.Ed. 329), and section 5 would be in a similar situation as an unconstitutional delegation of legislative power (Schechter Poultry Corp. v. United States, 295 U.S. 495, 529–542, 55 S.Ct. 837, 79 L.Ed. 1570; Panama Refining Co. v. Ryan, 293 U.S. 388, 429–433, 55 S.Ct. 241, 79 L.Ed. 446; J. W. Hampton, Jr., & Co. v. United States, supra; Field v. Clark, 143 U.S. 649, 692, 693, 694, 12 S.Ct. 495, 36 L.Ed. 294; Johnson v. Keating, 1 Cir., 17 F.2d 50, 52, 53; In re Mellea, D.C., 5 F.2d 687; Goodlove v. Logan, 217 Iowa 98, 251 N.W. 39.

Of course, we cannot assume that the President intended such a grant of wide, sweeping, and unfettered discretionary power to the customs officials or that Congress intended such a delegation of its lawmaking power, or that either intended to place a great burden of confusion and uncertainty upon the commerce of friendly nations.

An example of such confusion is apparent from an examination of the official papers in this case, which show that the merchandise was entered and appraised in West German deutschemarks. Such values, of course, can only represent the values of the merchandise in the principal markets of West Germany, the country from whence the merchandise was immediately exported.

Nevertheless, it is the Government's position that for the purpose of determining the rate of duty applicable to the merchandise it must be considered to be an importation from (and consequently an exportation of) the Eastern Zone of Germany, or Czechoslovakia, both communist-dominated or controlled nations or areas.

The inconsistency of this position is at once apparent. If, properly, the merchandise should be classified as an exportation of the Eastern Zone of Germany or of Czechoslovakia, it should be appraised at its value in the principal markets of those nations or areas and in the currency of those places. To appraise an importer's merchandise at its value in the principal markets and in the country from which it was immediately exported to the United States, and thereafter to assess customs duties on the same merchandise as merchandise of another country, from which reduced trade benefits and trade concessions have been withdrawn and suspended, are wholly inconsistent and confusing, and are probably unfair and discriminatory bases for taxation of an importer's goods.

Before closing this opinion, we feel it is necessary to refer to a matter brought up in the brief filed on behalf of counsel for the defendant in this case.

After having determined that the record in the Hercules Antiques case was insufficient to establish a *prima facie* case which would overcome the presumption of correctness attaching to the finding of the collector, the majority of our appellate court made the following observation:

"In the instant case there is a presumption that the merchandise is an import from Czechoslovakia, not only because the collector has so held, but also because it is conceded that the merchandise originated there. Such a presumption can be overcome only by clear evidence that something had happened to the merchandise before it was imported into the United States to convert it to an import from Holland. We are not at liberty to assume that because a considerable amount of glassware similar to that here has been in Holland for a long time, the same is also true of the particular articles under consideration. It was the importers' burden to show by proper evidence,

rather than by speculation and assumption, that the connection between those articles and Czechoslovakia had been so effectively broken that they could no longer be regarded as imports from that country."

We do not believe that our appellate court, by the observations just quoted, intended to be understood as spelling out the *only* means by which one who scks to controvert a finding made under the provisions of section 5 of the Trade Agreements Extension Act of 1951 and the applicable Presidential proclamations could discharge such a burden. There can be no question but that if, in such a situation, an importer was able to show by proper evidence that after the goods left the communist-dominated or controlled nation or area they had become part of the mass of goods belonging to the commerce of a non-communist country, a *prima facie* case would be made out in favor of the importer's claim.

However, it seems clear that the statute and proclamations do not require a showing to that extent. They require the proof of either one of two negative propositions—either that the involved merchandise was *not* the growth, produce, or manufacture of the communist-dominated or controlled nation or area, or that it had *not* been imported directly or indirectly therefrom. In other words, it is not necessary to show what the facts of origin or importation *were*, so long as it can be shown what they *were not*.

It having been shown that one or both of the conditions precedent to the application of the statute and proclamations are lacking, the basis for their application to the plaintiff's goods is lacking, and the normal reduced trade agreement rates apply.

Judgment will issue sustaining the protest claim accordingly.

OLIVER, Chief Judge (dissenting).

This opinion was originally prepared as the opinion of the court, but, in view of the position taken by my learned colleagues, my views, with certain modifications and comments, are now filed as a dissenting opinion.

At the outset, I want to emphasize that, in my opinion, the appraiser's action, referred to in the majority opinion, is not pertinent to the issue herein. Plaintiff's contention, as stated in counsel's brief, is as follows:

"Plaintiff contends that the merchandise the subject of the consolidated protests herein was not of East German or Czechoslovakian origin; and that in any event, said merchandise consisted of old, secondhand, or used articles manufactured more than forty years prior to importation, which had become a part of the commerce of West Germany; and that said articles were purchased by the plaintiff in the Western Zone of Germany and imported into the United States *directly from West Germany*. Plaintiff does not question the propriety of the classification of the merchandise at bar under the paragraphs under which returned, but claims that said merchandise was improperly assessed with the full rates of duty applicable to imports from Soviet-dominated territory; that said importation is neither a direct nor an indirect importation from East Germany or Czechoslovakia within the meaning of Sec. 5 of the Trade Agreements Extension Act of 1951 and the President's Proclamation and Letters of Notification to the Secretary of the Treasury issued thereunder; and that the articles at bar were accordingly entitled to the benefit of the reduced rates of duty fixed by the General Agreement on Tariffs and Trade and supplemental reciprocal trade agreements." [Italics quoted.]

In disposing of the issue as it is presented herein, I adhere to the reasoning followed and the statutory construction invoked by our appellate court in United States v. Hercules Antiques, Danwill Company, 44 C.C.P.A., Customs, 209, C. A.D. 662, which involved questions sub-

stantially the same as those now before us. Accordingly, I quote at length from different parts of the cited case as it construed various phases of the Presidential proclamation (86 Treas. Dec. 300, T.D. 52788), issued pursuant to section 5 of the Trade Agreements Extension Act of 1951 (86 Treas. Dec. 277, T.D. 52772), set forth in the majority opinion, and which gave rise to the present case.

In the Hercules Antiques case, supra, the merchandise consisted of secondhand or antique glass articles, such as decanters, covered compotes, and covered dishes that had been purchased in Holland by the importers' representative and shipped to the United States from that country. The goods were not manufactured in Holland, but originated in Bohemia, a part of Czechoslovakia, concededly a part of the so-called Iron Curtain country dominated by Soviet Russia. The majority of the appellate court overruled the importers' claim that the merchandise had been imported directly from Holland and held the articles to be indirect importations from Czechoslovakia, as claimed by the Government. In doing so, the statutory provisions involved were strictly construed. Emphasizing that the importer, in an issue such as that under discussion, has the burden to establish "by appropriate evidence that the merchandise has actually become a *bona fide* part of the commerce of the intermediate country," the majority of the court in the cited case stated:

> "If the goods of such countries [Communist-dominated countries] could be imported into the United States at reduced rates of duty merely because (instead of being brought in directly) they were purchased from dealers in other countries, it seems clear that such dealers could well make a practice of buying goods of that type with a view to reselling them to American importers. It is equally clear that such a practice would increase the commerce of the Communist-dominated country in which the goods were produced and would thus inure to the benefit of

that country. Whether the sale in the intermediate country was made privately or in the open market, by auction or otherwise, is not, of and by itself, controlling. The ultimate effect of such sales, however made, would be to permit the goods of Communist-dominated countries to reach the American market at a reduced rate of duty, and thus to compete on more favorable terms with the goods of countries which are not so dominated.

> "In our opinion a holding that the fact that the goods of a Communist-dominated country were merely purchased in another country was sufficient to permit them to be imported into the United States at reduced rates of duty would defeat the clear purpose of the Presidential proclamation, since it would permit the Communist-dominated countries to obtain the benefit of the reduced rates merely by dealing through agents in other countries. * * * *We are dealing here with a specific proclamation designed to accomplish a definite purpose. Under such circumstances it is clearly our duty to supply the interpretation which will best give effect to the intent of the proclamation.*" [Italics supplied.]

Expressing the "definite purpose" of the specific proclamation under discussion, the majority of the court stated that:

> " * * * in view of the evident objective of the Presidential proclamation, and its broad reference to 'articles imported directly or indirectly' from Communist-dominated nations, it seems clear that the proclamation looks to the substance rather than the manner of importation, and that its purpose is to deny reduced rates of duty to all imports which are so closely related to a Communist-dominated nation that such nation may derive benefit from the reduction in duty."

Construing the words "articles *imported directly or indirectly into the*

United States," the decision of the majority, in the cited case, reads as follows:

"There also appears to have been no prior decision as to the meaning of the expression "imported indirectly," but in United States v. United Cigar Stores Co., 1 Ct.Cust. App. 450, T.D. 31505, decided long prior to the instant proclamation, it was held that merchandise originally destined for the United States remained a *direct* importation from the country in which it originated, even though it was transshipped in an intermediate country, if it had not become a part of the commerce of that country. It is reasonable to assume, therefore, that the words 'imported indirectly' in the proclamation were intended to include merchandise which had been separated from the country in which it originated by something more than mere passage through or transshipment in an intermediate country. [Italics quoted.]

"It would be difficult, if not impossible, to define exact standards for determining the duration of stay of merchandise in an intermediate country, the nature of the transactions to which it is subjected there, and other circumstances necessary to divest it of its status as an import, direct or indirect, from the Communist-dominated country in which it originated. However, we are of the opinion it must be established by appropriate evidence that the merchandise has actually become a *bona fide* part of the commerce of the intermediate country. That responsibility which, of course, rests upon the importer has not been satisfactorily discharged here."

Under the pronouncements of the majority of our appellate court in the Hercules Antiques case, as hereinabove set forth, plaintiff, in this case, has not sustained its burden of proof. The principal witness was the president of the plaintiff corporation, who stated that he began importing glassware, chinaware, and earthenware, in July 1951, and that prior thereto he was "always sort of a hobbyist on these things." He stated that he bought the articles in question in the Western Zone of Germany from a dealer who had acquired them by advertising in local German papers, buying the things from homes and from the people. Although his testimony is generally to the effect that this merchandise consists of used articles, 40 to 50 years old, the witness admitted, in referring to certain glass items, that "they are even produced today." The witness testified further that part of the merchandise originated in the Western Zone of Germany and part of it originated in Bohemia, which is in the Eastern Sector of Germany and "included behind the Iron Curtain," but there is no showing what quantity or quantities of the merchandise originated in each of the separate divisions of Germany.

In the Hercules Antiques case, the majority of the court, finding the evidence to be insufficient, stated as follows:

"Again, there is no evidence whatever as to the history of the specific articles before they were purchased from dealers in Holland. There is nothing to show when, where, how, why, or from whom they were purchased by the dealers, nor when they entered Holland. So far as appears from the record they might have been exported to Holland from Czechoslovakia for the purpose of immediate re-sale on the very day they were purchased by the importers' representative. On this record we cannot properly conclude from the fact that they were sold in Holland by antique dealers that they had entered Holland long before their sale. There is no apparent reason why antiques from Czechoslovakia cannot be bought directly from there and resold by dealers in Holland. Similarly, the dealers in Holland from whom the merchandise was purchased might well have been acting as agents for persons in Czechoslovakia."

What is stated in the foregoing quotation has equal application, with the same force and effect, herein concerning plaintiff's proof in this case. There is no showing herein as to "when, where, how, why, or from whom" the articles in question were obtained by the German dealer from whom plaintiff purchased them, nor when they entered the Western Zone of Germany. So far as appears from the record, all of the merchandise in question might have been received by the German dealer (the foreign exporter) from the Eastern Sector of Germany or from communist-dominated territory, for the purpose of re-sale on the very day purchase thereof was made by plaintiff's representative. It cannot be concluded from this record that the particular articles under consideration entered the Western Zone of Germany long before their sale by the German dealer to the plaintiff.

There is a presumption, under the collector's classification, that the merchandise in question was "imported directly or indirectly" from the Soviet Zone of Germany, or the Soviet Sector of Berlin, or other communist-dominated territory. To overcome such presumption, it was incumbent upon plaintiff to show, by proper evidence that the connection between the specific articles involved herein and a communist-dominated country or territory "had been so effectively broken that they could no longer be regarded as imports from that country," the Hercules Antiques case, supra.

On the basis of the record herein and consistent with the statutory construction invoked in the Hercules Antiques case, the merchandise in question is properly dutiable at the rates assessed by the collector. The protests should be overruled.