## UNITED STATES *v.* SALOMON (No. 307).[1]

1. LANGUAGE IN COMMERCIAL USAGE.

  Language will be presumed to be used in commerce as in ordinary life and to establish that a term is used in commerce with a signification differing from that of the same term when ordinarily employed, its use in commerce must be shown to be general, uniform, and definite.

2. COTTON LINTERS.

  Short bits of lint that adhere to the seed of cotton in the ordinary process of ginning and are later stripped from the seed by a specially constructed gin, becoming then what are commonly known as "linters," are not waste, but cotton, and under paragraph 548, tariff act of 1909, are free of duty; and this, irrespective of a cleansing process to which the linters may have been subjected before importation.

United States Court of Customs Appeals, February 1, 1911.

APPEAL from decision of the Board of United States General Appraisers, G. A. 7050 (T. D. 30728).

[Affirmed.]

*D. Frank Lloyd,* Assistant Attorney General (*Martin T. Baldwin* on the brief), for the United States.

*B. A. Levett* for the appellees.

Before MONTGOMERY, HUNT, SMITH, BARBER, and DE VRIES, Judges.

HUNT, Judge, delivered the opinion of the court:

This is an appeal by the United States from a decision of the Board of General Appraisers at New York sustaining a protest by the importers, appellees, against the assessment made by the collector upon certain merchandise imported at New York.

The appraiser, in his report, held the merchandise to be cotton waste, which had been treated, bleached, and prepared for use in the manufacture of paper. Duty was assessed at the rate of 20 per cent ad valorem, under that provision of paragraph 313 of the tariff act of 1909, which reads as follows:

313. * * * Cotton waste and flocks, manufactured or otherwise advanced in value, twenty per centum ad valorem.

The importers claimed that the merchandise was free of duty under paragraph 548 of the tariff act of 1909, which reads as follows:

548. Cotton, and cotton waste or flocks.

The finding of the Board of General Appraisers was, substantially, that the article was cotton, and therefore free of duty.

The substance of the evidence of the importers is that the merchandise in question is made from what are called linters, a short-fiber cotton taken from the cotton machine; that the linters are boiled with a mixture of hot water and soda ash to loosen the dirt; that afterwards

---

[1] Reported in T. D. 31277 (20 Treas. Dec., 240).

chloride of lime is added to kill whatever dirt is left; that then the stock is washed in pure water, left to dry, put into bales, and shipped to this country; that the article is used principally for the manufacture of smokeless powder by the United States Navy and Army; that formerly cotton waste was sometimes used to produce the article, but that it was found unsuitable, as it contained hard stock, short waste cotton, short waste, which would not nitrate, and that nitration has to be absolutely perfect in order to produce an absolutely smokeless powder or guncotton; that the article never has been waste; that in the process of producing linters cotton is packed in the regular way, brought to the cotton gin, where the gin takes off the cotton as much as possible from the seed, but can not take it off entirely; that then this cotton seed is taken to a cottonseed-oil mill and before they get any oil out of the cotton seed they take certain fibrous material off the seed, and that which is taken off is called linters; that such a product is not a waste product, but is a short fiber cotton; that the linters have a certain commercial value, sold principally for smokeless powder purposes; that before the cotton seed is crushed they try to remove all the cotton; that the seed-crushing manufacturers have linters machines for the purpose of treating the seed; that there is hardly a trace of lime or soda left in the fiber at the proving grounds, but that this is removed by washing with pure water; that the treatment is very simple, in that it consists of putting the seed in a bath of chloride of lime, taking it out, putting it in a washer where water runs through it for some time, and then putting the stock to dry before baling; that the cotton comes over cleaned; and that it is used also for the manufacture of artificial leather, and for the purpose of making leather; that the cotton is American; that there are many different kinds of cotton waste, the chief use of cotton waste being for cleaning purposes, spinning, and packing; that there are so-called sweepings, cotton-waste sweepings, which, after cleaning, can be used for smokeless powder manufacture.

It appeared that Salomon Bros. & Co. had sold the article as cotton waste, to be used for manufacturing pyro guncotton for the manufacture of smokeless powder; that after procuring it the powder manufacturers clean it of dust by a beating process; that afterwards it is put through a picking machine and then put into a drying apparatus for taking the moisture out of it; that the picking machine has a shaft on which there are teeth revolving at high speed, which take the cotton as it passes through it and fluffs it up, loosens it apart so that it may readily accept the heat in the drying apparatus to take the moisture out. One of the witnesses said that he was familiar with linters and that quantities of it were used in manufacturing powder;

that linters, or the lint, is the cotton that is taken off the seed that has been through the ginning process.

Another witness testified that prior to 1897 merchandise like the exhibit in the case was known as cotton bleached or bleached cotton waste; that it was sold only to manufacturers of smokeless powder.

Patrick E. Hayes, a witness called by the Government, testified that he was an assistant superintendent of a manufacturing concern which made wadding and battings and dealt in cotton waste and the products of cotton; that he was familiar with cotton waste; and that prior to 1897 "cotton" meant "the product of the cotton field baled up in the various grades in which it is quoted in the daily exchanges, running from strict low ordinary up to strict good middling grades—that is, cotton from the lowest to the highest;" that the article in question would not come under the term "cotton;" that cotton waste prior to 1897 was the waste product from the cotton mills—"any kind of waste made from cotton in any way, and sometimes waste from waste where mills run waste and any sort of materials;" that the term "cotton waste" had a definite, uniform, and general understanding in the trade prior to 1897 which conformed to the answers just given; that in his business all sorts of waste material are offered to his firm; that some manufacturers bleach their cotton and then they run it, making a bleached waste; that there are dyed wastes, where the cotton is dyed before it is manipulated. Witness said he had never dealt in somkeless powder cotton prior to 1897; that he had not bought anything quite as short fiber as the merchandise in question, but that he had bought bleached waste "of that general color, etc.," generally for use in their mill.

Henry C. Lovis, a manufacturing chemist, explained how the article was produced, saying that the cotton fiber as taken from the bale is put through machinery for the purpose of removing the dirt, seed, and extraneous matter—anything but cotton fiber; that it then went through a process of boiling with alkalies, was then treated with bleaching chemicals, usually chloride of lime, and then treated with acids and intermediate washings and dried; that the article could be produced from cotton fibers or cotton waste. Witness defined linters as the fiber that comes from the cotton seed. It is the fiber not taken out in the very first process in the cotton gin, but is part of the same fiber that comes off in the cotton gin, but it is generally the shorter hair that remains on the cotton seed.

Another chemist called by the Government testified that he had made a chemical examination of the article and determined that the cotton had been treated in a way to eliminate the natural oil of the cotton, which he saw was shown by the fact that the fiber is absorbent; that if dropped on water it would sink, whereas ordinary cotton

or cotton as it comes from the fields, as known commercially, would float; that there was 0.6 of 1 per cent of ash in the exhibit shown.

George E. Moore, who is in the cotton business, testified for the Government that he had never dealt in such an article as herein involved, and had never known such an article to be bought or sold as cotton.

Counsel for the Government base their argument against the decision of the board upon the ground that the merchandise consists of a highly purified form of cotton produced from linters or linters waste. They say that the record shows that cotton linters is a form of waste and that the imported merchandise is cotton waste advanced in value by an elaborate purifying or manufacturing process, hence that the decision of the board is erroneous.

We find ourselves unable to agree with this contention. We can not find that "cotton" and "cotton waste," as the words are used in the sections of the tariff act quoted, are employed in a denominative sense. Commercial classification is commonly used in considering "short staple," "medium," "extra," "middling," and other grades of cotton, but the very meager testimony in the record to the effect that "cotton" and "cotton waste" have a definite commercial nomenclature falls far short of that measure of evidence required to establish commercial designation. No words of limitation surround the words, and we can not infer that as used in trade they have a meaning different from that which is popular; wherefore the rule that the language of a tariff act is presumed to have the same meaning in commerce that it has in ordinary use becomes applicable and controlling.

In Swan *v.* Arthur (103 U. S., 597), the Supreme Court said that:

* * * While tariff acts are generally to be construed according to the commercial understanding of the terms employed, language will be presumed to have the same meaning in commerce that it has in ordinary use, unless the contrary is shown. * * *

And, again, it is laid down that as necessarily commercial designation is a result of established usage in commerce and trade, such usage to effect a general enactment must be definite, uniform, and general, and not partial, local, or personal. This doctrine was well invoked by the Board of General Appraisers in the matter of the protests of Salomon Bros. & Co., reported in T. D. 27289. General Appraiser De Vries there considered the meaning of the words cotton and cotton waste or flocks, as used under the provision of paragraph 537 of the tariff act of 1897, and the words manufacture of cotton, as used in paragraph 322 of the same tariff act. In reaching the conclusion that Congress did not intend the words cotton and cotton waste as used in the aforesaid paragraph 537 to be limited in their scope to any trade

understanding, assuming that one such already existed, Judge De Vries said:

The words "cotton" and "cotton waste" as used in paragraph 537 are surrounded by no statutory indications that they are used in a commercial sense. In fact, they are surrounded by no limiting language. No word could be more comprehensive in use, no word could be surrounded by fewer limiting words, than the word "cotton" as used in paragraph 537, or "cotton waste" standing, as they do, by themselves. Both of these terms as used include every possible variety of cotton and every possible variety of cotton waste. Thus, in Schoellkopf v. United States (71 Fed. Rep., 694) the question was the scope of the paragraph of the free list, "671. Paraffin." The Circuit Court of Appeals for the Second Circuit said:

"The counsel for the Government contends that the word 'paraffin' in the free list refers only to the hard or waxy substance, but the evidence does not support this contention. *There is no question of commercial designation*, for the name of the article has no peculiar meaning when used in trade different from its popular meaning. * * * *The use by Congress of the single word 'paraffin' without any qualification manifests an intention to cover at least all varieties of the article which were known when the act was passed.*"

See also United States v. Wells, Fargo & Co., decided by this court, and reported in *supra*, page 158, T. D. 31211.

Turning now to the article under consideration, it is of common knowledge that the process of separating cotton seed from the lint cotton has been vastly improved since the invention of the cotton gin, the old-fashioned ginnery and screw having long since given way to the battery ginnery with its numerous saw gins, while the condenser and automatic press have superseded the wooden screw. And not the least among the successive improvements have been delinting machines, wherein many saws are set closely together and with finer teeth than those in the ginning machine, the purpose being to constitute a mechanical arrangement whereby the short fiber or linters are successfully removed from the cotton seeds.

What are called linters by the current of recognized works on cotton and cotton seed, are short bits of lint that adhere to the seed of the cotton in the ordinary process of ginning, and are stripped by a specially constructed gin. This description of linters would clearly put them within the definition of cotton, or the soft, downy vegetable fiber surrounding the cotton seed, and so be applied to them as part of the cotton as much as to the longer fibers removed in the first ginning process.

The idea that "linters" is a waste seems to us to be inexact. It is not a refuse from the cotton first ginned, but a part of the original fiber about the seed not separated by the first ginning machine, but obtained by a reginning in a machine of somewhat similar mechanism. Waste ordinarily implies superfluous, useless, or rejected material, something left over, as the refuse of cotton manufacture. Let it not be understood that we mean to hold that Congress has used

the word waste in the tariff act as meaning that which has no value—worthless remnants—but that waste is something which is, generally speaking, left over in the treatment of the material, once obtained, as contradistinguished from the treatment to obtain the material itself. In Standard Varnish Works *v.* United States (59 Fed. Rep., 456), the court said:

\* \* \* Congress evidently did not use the word as meaning "that which is of no value; worthless remnant; refuse,"—the primary definition given in Webster's Dictionary,—since it imposed upon it an ad valorem duty. The Century Dictionary defines "waste" as "broken, spoiled, useless, or superfluous material; stuff that is left over, or that is unfitted, or can not readily be utilized for the purpose for which it was intended; overplus; useless or rejected material." This definition exactly fits spoiled, superfluous, or rejected material, which is of the same kind as the material utilized for the intended purpose. \* \* \*

The court there cited with approval the ruling In re Higgins (55 Fed. Rep., 278), where it was said that "garnetted waste is the product of a garnett machine, which tears and ravels out the twist in thread, thus reducing it back to the original purified wool by reason of taking out the twist which is originally given to the wool to make it yarn or thread," and held that it was plain that the waste was still wool. And in speaking of waste rope and waste bagging, provided for in paragraph 670 of the tariff act of 1890, it was argued that although such waste was unfitted for the purpose for which the bagging or rope was intended, the waste was no new creation, but was the same substance as the bagging or the rope which was used for the intended purpose.

To conclude the brief discussion that we have entered upon, we will say that cotton waste means that superfluous article or stuff remaining after some treatment of cotton—that is, cotton waste presupposes cotton which has been obtained, used, or treated in a way to make or leave a superfluous or refuse article. But it does not seem to us that the fine fibers which surround the capsules should be regarded as a cotton waste, merely because the seed to which such fiber clings has to be given a second treatment in a machine which was not so perfect as to separate such finer fibers in the first treatment. Or we might put it in this way: Clinging to the cotton seed there are fibers of several kinds. Those of the one kind may be easily separated by one process of ginning; those of another kind by another process of ginning; but the product obtained by the processes is none the less cotton, and nothing else. And as the material is cotton, the fact that it is cleansed and dried before importation is immaterial to the issues of this case.

It follows that the Board of Appraisers was right, and their decision must be sustained.

*Affirmed.*