(C. D. 485)

Parodi Erminjo & Co. *v.* United States

United States Customs Court, Third Division

(Decided May 2, 1941)

Lawrence & Tuttle (*George R. Tuttle*, and *Charles F. Lawrence*, of counsel), for the plaintiff.

Charles D. Lawrence, Acting Assistant Attorney General (*Joseph E. Weil*, and *Richard F. Weeks*, special attorneys), for the defendant.

Before Cline, Evans, and Keefe, Judges

Cline, Judge: This is a suit against the United States in which the plaintiff seeks to recover additional duty assessed at the rate of 10 per centum ad valorem under the provisions of section 304 (b) of the Tariff Act of 1930 on the ground that the merchandise was not legally marked when imported.

The record shows that the merchandise upon which the additional duty was assessed consists of olive oil which was shipped from Marseilles, France, in February, 1937, and entry was made at the port of San Francisco on April 8, 1937. The appraiser reports that the

drums containing the olive oil "were marked France indicating that the olive oil was the product of that country when as a matter of fact the oil was produced in Spain."

At the trial the plaintiff produced the United States customs examiner, the appraiser, the customs broker, the importer, and the representative of the ultimate consignee who testified as to the examination, release and disposal of the merchandise. It appears from this testimony that the merchandise was imported in drums; that no question regarding the marking was raised at the time of examination or release of the goods; that when the ultimate consignee received the merchandise he opened the drums and deposited the oil in vats in his warehouse, after which it was put in small containers for sale; that on August 13, 1937, the importer was notified that the goods were not legally marked and he was directed not to dispose of the oil until it was properly marked. This notice to the importer was admitted in evidence and marked exhibit 1. There was introduced in evidence also a document attached to the invoice having the heading "Declaration of Shipper of Food and Drug Products," which was marked "exhibit 3." It contains the declaration of the seller in which it is stated that "These products were grown in Spain and manufactured in Borjas by us during the year 1936, and are exported from Marseilles and consigned to San Francisco."

The plaintiff introduced also the testimony of Mr. Louis Bourguignon, taken by deposition before the Vice Consul of the United States at Marseilles, France. The witness testified that he purchased the olive oil at Marseilles on January 12 and January 19, 1937, from a Spanish seller who brought the merchandise to Marseilles by boat; that the olive oil was carried to the warehouse of his firm, the Establissements Puget (the shipper), where it was emptied into vats; that subsequently it went through three separate filtering operations and was then put into new iron barrels either made in France or in Belgium and was ready for shipment to the United States on February 25, 1937; that the oil was purchased outright by Establissements Puget and was put in stock under temporary customs permission, the owner being obliged to export it; that the purchase was not made for the account of J. G. Dreyfus, who is noted on the invoice as the purchaser of the merchandise.

The main question involved in this case is whether the merchandise is a product of France or of Spain. If it is the product of France, the marking on the drums was legal, but, if it was the product of Spain, the marking was not legal because it would not indicate the country of origin thereof. The uncontradicted evidence shows that the oil originated in Spain; that it was sold to a firm in France where it was put in vats after which it was filtered three times and packed in iron barrels or drums. The question arises as to whether the filtering

process makes the oil a manufacture of France. We are of opinion that it does not. It was still olive oil after that process and was not a different commodity. A cleansing process is not a manufacture. In the case of *Passaic Worsted Co. et al* v. *United States*, 17 C. C. P. A. 459, T. D. 43916, in holding that a machine which cleaned wool was not a textile machine, the court said:

Ever since the creation of this court it has held, consistently, that the mere cleansing of an article, or "getting it by itself," is not a manufacturing process. This rule is so well understood that it requires no elaboration here. *United States* v. *Salomon*, 1 Ct. Cust. Appls. 246, T. D. 31277; *United States* v. *Brown & Co.*, 10 Ct. Cust. Appls. 47, T. D. 38295; *United States* v. *Stone & Downer*, 12 Ct. Cust. Appls. 293, T. D. 40296; *United States* v. *Makaroff et al.*, 16 Ct. Cust. Appls. 531, T. D. 43263. Therefore, these machines are not used in the manufacture of textile materials, and, it follows, are not textile machinery within the meaning of the paragraph.

There remains to consider the question of whether Spanish olive oil which was packed in France and shipped from that country to the United States should be marked "Spain" or "France" to indicate the country of its origin. The same question was considered in *Kunreuther & Merfeld, Inc.* v. *United States*, C. D. 379, in which case the court held that hops which were grown in Czechoslovakia and were packed in Germany and shipped from that country should be marked to indicate that Czechoslovakia was the country of origin. The court reviewed earlier marking decisions relating to merchandise produced in one country and shipped from another, *Lobaw Groceterias, Inc.* v. *United States*, 64 Treas. Dec. 605, T. D. 46760; *Closset & Devers* v. *United States*, 73 Treas. Dec. 1112, Abstract 37655; *Reichenbach & Co., Inc.* v. *United States*, 1 Cust. Ct. 430, Abstract 39532. We deem it unnecessary to incorporate the same matter in this decision. The case of *United States* v. *Friedlaender & Co., Inc.*, 27 C. C. P. A. 297, C. A. D. 104, cited by the plaintiff in this case, was discussed in *Kunreuther & Merfeld, Inc.* v. *United States, supra,* and distinguished. The appellate court quoted the definition of the words "country of origin" in article 528 (c) of the Customs Regulations of 1937 as amended in T. D. 49658, 74 Treas. Dec. 43, 68, as follows:

The country of origin means the country of manufacture or production. Further work or material added to an article in another country must effect a substantial transformation in order to render such other country the "country of origin" within the meaning of this article.

While the above regulation was promulgated after the importation in this case, it does not appear to involve a change in practice because substantially the same directions were given by the Treasury Department in T. D. 44370 (11), 58 Treas. Dec. 555, and T. D. 47946 (6), 68 Treas. Dec. 428.

The plaintiff cites also *D. & B. Import Corp.* v. *United States*, C. D. 380; *Maier Morton & Browne* v. *United States*, 11 Ct. Cust. Appls.

115, T. D. 38753; *Acker* v. *United States*, 1 Ct. Cust. Appls. 404, T. D. 31481; and *United States* v. *G. W. Sheldon & Co.*, 53 Treas. Dec. 34, T. D. 42541, but we are of opinion that those cases are not in point. They do not involve the marking law but relate principally to questions of whether shipments from one foreign country were transshipments from another country and to whether the values in the country of production or the treaties or trade agreements with that country were applicable.

We find that the merchandise in this case is a product of Spain and hold that the marking of the immediate containers with the word "France" was not a compliance with the marking law. The protest is overruled. Judgment will be entered in favor of the defendant.