(C. D. 959)

M. H. GARVEY CO. v. UNITED STATES

United States Customs Court, Second Division

(Decided October 19, 1945)

*Henry L. Ziegel* for the plaintiff.

*Paul P. Rao*, Assistant Attorney General (*Charles J. Miville, Daniel I. Auster,* and *Richard E. FitzGibbon*, special attorneys), for the defendant.

Before Tilson, Kincheloe, and Lawrence, Judges

Kincheloe, Judge: These suits are for the recovery of certain duty alleged to have been wrongfully collected by the collector of customs at the port of Boston on certain importations of cotton waste from Japan by reason of the improper classification thereof. The merchandise was assessed for duty under paragraph 901 (c) of the Tariff Act of 1930, as "Cotton waste, manufactured or otherwise advanced in value," at 5 per centum ad valorem. It is claimed by the plaintiff company to be free of duty under paragraph 1662 of said act as "Cotton, not specially provided for," or as "cotton waste."

The merchandise is described on the invoices as cotton waste of certain type designations or numbers, and is represented by samples thereof marked in evidence as exhibits 1 to 8. A duplicate set of samples taken from the original exhibits has also been put in evidence as exhibits 1–A to 8–A. The plaintiff in its brief claims that the merchandise in issue consists of various grades of cotton waste which have been reclaimed from mill wastes in which fly waste predominates, which mixtures were cleaned simply for the purpose of separating the cotton fibers from dirt and other impurities so as to obtain merchantable grades of cotton waste.

Four witnesses testified herein on behalf of the plaintiff, including the deposition of one Ira A. Stone, taken by commission at Augusta, Ga., consisting of 28 questions and answers, which was read in evidence and marked "Exhibit 9," subject to the objections raised by counsel for the Government to certain of the interrogatories and the answers thereto, or parts thereof, the rulings thereon, and the exceptions thereto.

The deposition of said deponent Ira A. Stone is to the effect that he is vice president of the Riverdale Mills, Augusta, Ga., dealers in and processors of cotton waste; that he is a graduate of the Lowell Textile Institute, and has had 30 years' experience in purchasing, selling, grading, and processing of cotton waste; that he is familiar with the origin of various types of cotton waste which occur as byproducts in the process of spinning cotton into yarn; namely, picker, fly, strips, comber, sweeps, threads, etc.; that he has dealt in cotton waste throughout the United States and in foreign countries such as Holland, England, Belgium, France, India, China, Japan, and Brazil; that he is

familiar with cotton waste of the types or numbers designated on the invoices, such as "FFA Fly," "Fex Fly," "Dunn Fly," etc.; that he took part in the purchase of these types in the country of origin for account of the Royal Manufacturing Co., the importers of the merchandise herein, as he was 3 years in China and Japan dealing in cotton waste of all types, and was a vice president of the Royal Manufacturing Co. at the time these shipments were being exported from China and Japan; and that he has seen these imported types of cotton waste cleaned and baled for shipment in the countries of origin. He described the method by which this cotton waste was processed for the purpose of cleaning and bringing it to the condition when baled for shipment to the United States as follows:

Various grades of fly waste and spin sweeps are willowed and cleaned by beating with wooden paddles, the laborers tramping over the material with their feet, and using both their feet and wooden paddles to beat out the dirt and other foreign substances. This work is done over wooden grills which permit the chaff and dirt, etc., to drop out. China clay is added from time to time for the purpose of absorbing the oil, to give the waste a better color, and to add weight. The above process causes the material to flatten out, and it is then picked up in flat armfuls, laid on flat baskets, and carried by hand to the baling press, where it is baled by hydraulic pressure. (Ans. to Interrogatory #12.)

Deponent further stated that the mill waste from which several types of the cotton waste in issue were obtained was fly waste, spin sweeps, and some picker waste; that the process of cleaning just described was to put the merchandise in merchantable condition and to avoid the payment of freight on dirt and other substances. The purpose of adding clay, he stated, was for drying any oil present in the waste and loading for weight—an oriental custom. Deponent also stated that the waste is baled under hydraulic pressure resulting in a high-density packing about one-half the cubic size of an ordinary bale not so packed; that this high density form of baling results in a matting of the fibers and therefore requires special handling in opening up the contents by means of an opener or breaker before it can be subjected to further processing; that the general use of this kind of waste in the United States is in the production of batting and felting to be used in the manufacture of mattresses, upholstery, etc.; and that it is not possible to make use of this waste in its imported condition for any purpose without first processing or manufacturing it in some manner. First, it must be loosened up by means of an opener or breaker and then subjected to further processing or blending and carding in order to make it into the form of batting, felting, etc. Deponent further stated that not all picker or fly waste is of the same grade or quality, but depends on the quality of the original cotton, the condition and adjustments of the machines through which the original cotton was being processed into yarn, and other variations in the method of manufacture; that the mechanical cleaning of

cotton waste fibers does not improve the quality of the individual fibers, because it invariably shortens and weakens the fibers; and that these imported wastes are inferior to any corresponding grade of domestic willowed fly waste. Also that the term "cotton waste" is not limited to mill wastes, and that the term embraces every type and grade of cotton waste whether it occurs in the original processing of the cotton into yarn, or whether it consists of accumulations and mixtures of various mill wastes which have been cleaned to bring them to a merchantable condition. Furthermore, that there is no trade term such as "cotton waste manufactured" or "cotton waste advanced in condition" used in the cotton waste business; and that based upon his experience, the wastes in issue come within the term "cotton waste" as that term is commonly used and understood in the trade.

George H. Adler, vice president of the Royal Manufacturing Co., the importers of the merchandise in question, testified that his company are manufacturers of cleaning waste and dealers in and processors of cotton mill spinning waste; that he has bought and sold every grade of cotton waste, of which there are many, and has imported same from many countries, including China and Japan. He named the following cotton wastes in the order of their happening in the mill: Picker (motes), fly, strip, slubbing waste, roving, comber, cleaner, spinner (laps), threads, and sweeps; also other types, such as willowed picker, willowed fly, willowed or cleaned material, soiled and oily card waste, etc. He described the cotton waste represented by exhibits 1 to 8 as cleaned fly waste containing types of fly waste or dry spin sweeps; that in these exhibits there are certain natural impurities found in grades of cotton waste coming from the cotton, which are parts of the plant, seed, and hull that have been crushed in the cleaning process, also China clay. The witness stated further that fly waste consists of the fibers thrown off from the carders and which drop to the bottom of the machine; that this fly waste is mill waste; that it is cleaned, and then sold for use in the manufacture of mattresses and for stuffing furniture, etc. The same witness further confirmed deponent Stone to the effect that the merchandise represented by exhibits 1 to 8 could not be used for any commercial purpose without first being processed; that in the cotton-waste business there is no such term as "cotton waste manufactured" or "cotton waste advanced in value"; that, while the cleaning process costs something, it did not advance the waste in value, but only brought it to a salable or merchantable condition; and that the imported merchandise was still nothing more than cotton waste.

The two other witnesses who testified for the plaintiff were Walter D. Lane, of W. D. Lane & Co., dealers in cotton mill waste since 1920, and in the business since 1890, during which time he bought and sold

all kinds of cotton mill waste, and also saw it produced, and Clarence R. Smith, vice president of the firm of S. L. Ayers & Co., Boston, Mass., dealers in cotton and woolen-mill waste, and who was president of the Philadelphia Cotton Waste Association, and was also connected with the Cotton Waste Exchange at Boston. It is hardly necessary to review the testimony of these two well-qualified witnesses other than to say it fully corroborates that of deponent Stone and the witness Adler.

On its part the Government called six witnesses. The first was Harold C. Cornell, examiner of merchandise at the port of Boston, who previously had been employed in various cotton mills. The second was Thomas H. Gourley, teacher at the New Bedford Textile School at New Bedford, Mass., where he is head of the carding and spinning department, and also teaches physical testing, microscopy, and textile economics, and who has had extensive experience with the processing of cotton into yarn and has become acquainted with the various wastes resulting therefrom. The other four witnesses were men in the cotton-waste business.

It is quite evident from the testimony of all of defendant's witnesses and from the defendant's brief that the Government assumes that any cotton waste, in order to be entitled to free entry under paragraph 1662 of the tariff act must be "primary" waste, that is, waste as it falls or comes from the different machines in the various stages of processing raw cotton into cotton yarn, and that if such waste has been cleaned in any way to eliminate dirt or impurities it automatically becomes cotton waste manufactured or advanced in value, and that, even if the cleaned cotton waste is inferior in quality to the so-called "primary" waste and is of less commercial value, it would still nevertheless be cotton waste manufactured or advanced in value under said paragraph 1662 by reason of the cleaning process, which it presumes has increased the value of the cotton waste at least to the extent of the cost of such cleaning operation.

For instance, defendant's witness Gourley testified that he would not consider exhibits 1-a to 8-a cotton waste, because he found some threads in it. In other words, that it is not the original cotton waste that would come from some manufacturing process, and that something had been done to it. He stated further that manufactured cotton waste was a waste which has been put through some cleaning process to make it cleaner than it was, and would therefore sell at a higher price (R. 66).

Defendant's witness Kenyon testified that exhibits 1-a and 2-a were not fly waste as he knows it—not fly waste in its original state; that it has been cleaned some, which advances it in value over its original value. Exhibits 3-a and 5-a he stated looked like original fly waste as taken from a carding machine, and that it is not manu-

factured or advanced in value. Yet as to exhibit 4–a, he stated that that waste had been deteriorated; that he thought there was trunk waste and motes added to that. When asked whether that was manufactured waste, he answered "I should say it had been manufactured downgrade," and that he thought it had lost some of its original value (R. 71). Exhibit 6–a he stated was trunk waste, which is an inferior grade of waste and has not the commercial value of fly waste; that it is not fly waste, as he knows it, and that in his opinion it has not been manufactured or advanced in value. Exhibits 7–a and 8–a he considered manufactured in some manner and advanced in value. When asked if cleaning cotton waste would advance it in value he stated "It advances the value in this way: So long as your cleaning process improves the fiber, that advances it. If, however, in your cleaning process you do something that may cut the fiber you might cause deterioration, but so long as it is an improvement in the fiber the value increases." He stated further that the cleaning process makes the fiber shorter, if anything, but eliminates the dirt, seeds, hull, etc., and that the purpose of the cleaning process is to get the cotton waste fiber by itself. He nevertheless considered exhibits 1–a to 8–a manufactured or advanced in value, because "Anything that takes dirt out or anything that operates on the cotton fiber to remove the unwanted things enhances the value of what cotton part is left" (R. 72/80).

Defendant's witness Lehner testified that in his opinion none of exhibits 1–a to 8–a was primary waste as it comes out of a cotton mill, because the fibers were more parallel than they have been in the habit of getting out of the cotton mills in this country. He admitted however that the condition of the fibers in said exhibits might be brought about from cleaning cotton waste on a carding machine, which would result in paralleling of the fibers. He could not tell, however, what process the various lots of cotton waste in question were put to to bring them to their imported condition (R. 97/99).

Witness McInnes could not tell from an examination of exhibits 1–a to 8–a what kind of merchandise they were, except that they were cotton fibers, but not primary waste of a cotton mill; that the fibers were more parallel than if they were primary waste, but that that might be the result of cleaning on a carding machine, but not on a picker or willow. The witness admitted that the merchandise was essentially cotton waste, and that the very act of separating the fibers in handling them would cause them to become parallel (R. 100/104).

The last of defendant's witnesses, Waldstein, testified that he could not tell what exhibits 1 to 8 were, except that they were a conglomerate mass, but not primary waste, and that the invoice description of "carded fly-cotton waste" would suggest to him that

it was run through a carding machine for cleaning and straightening the fibers, and that the merchandise in its imported condition would have to be processed further before it could be used for any purpose (R. 106/109).

We know of no case, nor has any been cited to us, wherein the term "cotton waste," standing alone, has been construed as limited to so-called primary waste, ·i. e., waste in its original condition as it falls from or is thrown off by the various machines in the production of cotton yarn. On the contrary, as far back as 1914, this court (then the Board of General Appraisers) in Abstract 35736 (26 Treas. Dec. 895) had before it (1) merchandise produced by running old lace curtains through a shredding machine; (2) clippings from towels run through the same kind of machine, which pulled the fabric apart; and (3) white and colored threads indiscriminately mixed. The testimony showed that the merchandise was bought and sold as "cotton waste"; that after importation it was further manufactured by mixing with other ingredients and putting through another machine, when it became "machine cotton waste" used for wiping machinery; that the merchandise in its imported condition was not suitable for wiping machinery. The court, in holding the merchandise to be free of duty as "cotton waste" under paragraph 548 of the Tariff Act of 1909, stated as follows:

* * * To hold otherwise would mean that merchandise which has been manufactured into machine cotton waste would be admitted free of duty, while the refuse or raw materials from which such machine cotton waste is manufactured could not be so admitted. The general policy of imposing tariff duties is to tax the manufactured products higher than the unmanufactured products. It would be an extraordinary and dangerous exercise of judicial power to hold that Congress intended to levy a duty on a raw material and admit the ultimate and finished product free.

The court in said case also referred to the case of *United States* v. *Salomon*, 1 Ct. Cust. Appls. 246, T. D. 31277, in which the appellate court quoted with approval the definition given by Judge De Vries of the term "cotton waste" in G. A. 6339, T. D. 27289 (11 Treas. Dec. 549), as "every possible variety of cotton waste." Note also G. A. 6390, T. D. 27453, wherein "cotton waste" as used in paragraph 537 of the Tariff Act of 1897 was defined as "covering all waste material left over in the manufacture of cotton goods in cotton mills."

In the present case the testimony of both the plaintiff and the defendant is in agreement that the merchandise in question consists of cotton waste of some kind, and the only question in issue, therefore, is whether the cotton waste was "manufactured or otherwise advanced in value" within the meaning of the tariff act, as claimed by the Government.

The Government cites the case of *Marathon Rubber Products, Inc.* v. *United States*, T. D. 46679 (64 Treas. Dec. 369), and the case of

*Fujii Shoten* v. *United States,* 17 C. C. P. A. 79, T. D. 43362, presumably as authorities for holding the present merchandise dutiable as cotton waste manufactured or advanced in value, as assessed, or at least as authorities for not holding the merchandise free of duty simply as cotton waste under said paragraph 1662.

In the *Marathon* case, just cited, the merchandise consisted of certain dyed cotton flock made from fragments of waste cotton fiber which had first been cleaned and freed from all dirt or other foreign substances, then run through a breaker or coarse grinding machine, after which the material was then run through a cutting machine, which further reduced the material to the form of powder. The powder was then put through a bolting machine and sifted to remove all coarse particles therefrom, after which the powder was run through a dyeing process and dried, after which it was used to give a suedelike finish to rubberized fabrics. The merchandise had been assessed for duty as a manufacture of cotton, not specially provided for, under paragraph 921 of the act of 1922 and paragraph 923 of the act of 1930. It was, however, held dutiable as a nonenumerated article manufactured in whole or in part, under paragraph 1459 of the act of 1922 and paragraph 1558 of the act of 1930, as it was deemed that the fragments of the waste cotton fiber of which the dyed cotton flock was made had lost their identity as commercial cotton and that the flock, therefore, was not properly dutiable as a manufacture of cotton, as assessed. Obviously it was also more than cotton waste manufactured or advanced in value; namely, a new article with a different name and use, so that we fail to see any analogy whatever between that case and the one at bar.

In the case of *Fujii Shoten* v. *United States,* cited by Government, *supra,* the merchandise consisted of cotton wadding, also known as cotton batting, cotton felt, and felted cotton. It was assessed for duty as a manufacture of cotton not specially provided for under paragraph 921 of the Tariff Act of 1922. It was claimed by the importer to be simply "cotton" and therefore free of duty under paragraph 1560, reading "Cotton and cotton waste," or dutiable under paragraph 901 as "cotton waste, manufactured or otherwise advanced in value." The testimony showed that the so-called wadding was not made from a waste, but from commercial cotton, i. e., cotton in its ginned state, with the lint and seed removed; that it was first placed into a breaker picker, usually situated on an upper floor, in which the cotton was fed upon a lattice to spiked rollers placed in successive pairs, the function of which was to pull the slabs of cotton apart and dash it against a series of grid bars through which the dust and heavy dirt passed; that the product was then passed along an inclined plane to the picking machine, which was usually situated on a lower floor; that in this machine the partly cleaned cotton passed

through feed rollers and was subjected to two blade beaters revolving at a high rate of speed; that this converted the cotton into a fleecy mass, and then it was again forced against grid bars, further cleaning it of dirt and impurities; that it was then passed through rollers to a card machine, from whence it was passed on in a filmy webbing of fibers to what was called an apron and then through rollers onto a metal flat; that successive webs kept coming and were placed one on top of the other by the machine until the required thickness was obtained, the result being a product formed of interlaced, interwoven cotton fibers.

Here again the merchandise had lost its original identity, which, however, happened to be raw cotton and not cotton waste, and could no longer be used for the ordinary purposes of cotton spinning without first being reduced to the fiber state and recarded. Furthermore, in its said newly manufactured state it was commercially known as cotton wadding, cotton batting, cotton felt, and felted cotton, etc., with a number of distinct uses, such as for the making of comforters, upholstery, automobile cushions, mattresses, pillows, and numerous other uses. The merchandise was therefore held properly dutiable as a manufacture of cotton under paragraph 921 of the Tariff Act of 1922, rather than free of duty as cotton under paragraph 1560. Clearly that case also bears little, if any, analogy to the present one.

It is a well-established principle in customs law that the mere cleaning of imported merchandise, mechanically or otherwise, to eliminate dirt or other foreign substances, or to get merchandise by itself, is not a manufacturing process, nor does it necessarily advance the merchandise in value. Note *In re Lane & Co.*, G. A. 8729, T. D. 39966, on willowed cotton picker waste, and authorities therein cited.

In *United States* v. *Salomon*, 1 Ct. Cust. Appls. 246, T. D. 31277, so-called linters, consisting of short bits of lint that adhered to the seed of cotton in the process of ginning, and later stripped from the seed by a specially constructed gin, becoming then what is known commonly as "linters," were held not to be cotton waste, manufactured or advanced in value, but simply cotton, free of duty under paragraph 548 of the Tariff Act of 1909, and this irrespective of the cleaning process to which the linters may have been subjected before importation.

Another case which we think is even more in point is that of *Simpson* v. *United States,* 2 Ct. Cust. Appls. 222, T. D. 31952. There, certain cotton waste recovered from mill sweepings or used cotton waste was held not "advanced in value" by processes of combing, washing, and bleaching in the sense implied by "advanced in value" appearing in paragraph 313 of the Tariff Act of 1909, and that it was free of duty under paragraph 548 of that act, reading "Cotton, and

cotton waste or flocks." It had been shown that the merchandise was the product either of cotton waste which had been used for cleaning machinery or of the mill sweepings of cotton mills, or of a mixture of both, and that the said used cotton waste and the mill sweepings were in fact spoiled cotton wastes which had no value in their foul condition either to the consumer or the manufacturer of cotton waste. It was not, however, thrown away as worthless refuse, but was sold to those who made a business of bringing such materials to some degree of usefulness as cotton waste by separating the cotton fiber therein from its impurities by putting the material through a machine which combed out the dirt and other foreign matter, with the exception of the oil and grease absorbed by the fiber, which latter were eliminated by washing the cotton with water and acids. While such washing bleached the material to some extent, it was, however, evident that the primary purpose of the washing was not to bleach but to cleanse, and that whatever bleaching resulted from the use of acid to remove the grease and oil was more than counterbalanced by injury done to the fiber, and that then the material reached the stage of a very low grade of cotton waste.

The court accordingly found that the cotton waste there in issue was a reclaimed or recovered cotton waste of low grade; that it had not been restored to its natural state, much less advanced beyond that condition; that it had not been manufactured or advanced in value after its restoration to the status of a cotton waste; and that it was inferior to the normal cotton waste, which, though worth more, was admitted free of duty. The court, therefore, held the merchandise free of duty as cotton waste under paragraph 548 of said act of 1909, and in so doing stated:

* * *. To hold otherwise would mean that a cotton waste just as it falls from the mill must be admitted free and that an inferior cotton waste recovered from the same material after it has become refuse by use or otherwise can not be so admitted, which would be an anomaly the introduction of which into the tariff law of 1909 we can not assume was the real intention of Congress.

In our opinion, the reasoning and holding in the foregoing case are entirely applicable in the present instance. Here, according to the testimony of plaintiff's witnesses, the imported merchandise before it was subjected to the cleaning process described by them evidently consisted of various grades of cotton waste reclaimed from mill wastes, or a mixture of them, in which fly waste predominated. The witnesses for the defendant testified that they did not consider any of the present merchandise to be primary waste, although their testimony at the same time shows that with the possible exception of exhibits 3–a and 5–a, it is inferior in quality and value to the so-called primary waste. In other words, the only reason for claiming the merchandise to be cotton waste manufactured or advanced in value is on account

of the cleaning process to which it was subjected. The point was made by some of defendant's witnesses that the cotton fibers in the imported merchandise were more parallel than in the case of primary waste, but admitted that this might be the result of cleaning on a carding machine.

We have already pointed out that there is no legal authority for holding that the cotton-waste provision of said paragraph 1662 is limited to primary waste, but that on the contrary it would seem to cover every possible variety of cotton waste, and, as testified by deponent Stone, "embraces every type and grade of cotton waste whether it occurs in the original processing of the cotton into yarn or whether it consists of accumulations and mixtures of various mill wastes which have been cleaned to bring it to a merchantable condition."

As to any possible improvement in condition or increase in value of the cotton waste as the result of the cleaning process applied, we think the testimony of the defendant's own witnesses clearly indicates that the cotton waste was still below the quality and value of the so-called primary cotton waste, and certainly was not advanced in condition or value beyond that of merchantable cotton waste. An inspection of the official samples also supports such conclusion.

On the record we therefore find the merchandise in question to be cotton waste, not manufactured or advanced in value, and on authority of the cases cited, *supra*, we hold the same to be free of duty under paragraph 1662 of the Tariff Act of 1930, as cotton waste.

Judgment will be rendered accordingly.