UNITED STATES v. McLAUGHLIN & FREEMAN (No. 4556)[1]

United States Court of Customs and Patent Appeals, June 3, 1947

*Paul P. Rao*, Assistant Attorney General (*Richard F. Weeks*, special attorney, of counsel), for the United States.

*Eugene R. Pickrell* for appellee.

[Oral argument May 14, 1947, by Mr. Weeks and Mr. Pickrell]

Before BLAND, Acting Presiding Judge, and HATFIELD, JACKSON, and O'CONNELL, Associate Judges

HATFIELD, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court, Third Division, C. D. 1008, holding certain so-called "peanut

[1] C. A. D. 368.

acid oil" dutiable as a nonenumerated unmanufactured article at 10 per centum ad valorem under paragraph 1558, of the Tariff Act of 1930, as claimed by the importer (appellee), rather than as a non-enumerated manufactured article at 20 per centum ad valorem, under the same paragraph, as assessed by the collector at the port of Boston.

Paragraph 1558 reads:

That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated or provided for, a duty of 10 per centum ad valorem, and on all articles manufactured, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem.

Evidence was introduced by each of the parties.

Two witnesses testified for appellee; namely, Jacob Peter Spierenburg, managing director of the N. V. Oliefabriek "Schiedam" at Zwijndrecht, Holland, the company which produced the imported material, and Dr. Harvey A. Seil, who at one time was in the Bureau of Chemistry of the United States Department of Agriculture, but who at the time he testified, was an analytical and consulting research chemist in New York.

It appears from Dr. Seil's testimony that he has appeared for the Government and also for importers as a witness in various cases. His qualifications are not challenged by counsel for the Government.

The Government introduced the testimony of a Government chemist, Dr. Louis B. McSorley.

It appears, among other things, from the testimony of appellee's witness, Mr. Spierenburg, that

Crude peanut oil is neutralized by adding a basic solution in order to produce in this way an edible oil from crude oil. How this neutralized oil is further worked has no bearing on this suit. *The remaining fatty acids, bound to a part lye and neutral oil, settle on the bottom of the neutralizing tank. By adding sulfuric acid, the lye is neutralized and in this way a useful fatty acid (acid oil) remains.* [Italics ours.]

Both of the witnesses for appellee testified that the imported product consists of the free fatty acids which were present in the peanut oil from which the involved product was produced.

It appears from the record that, in order to obtain edible oil from crude peanut oil, it is necessary that the free fatty acids contained in the crude product be removed; that, in order to remove such free fatty acids, a water solution of an alkali, such as sodium hydroxide is combined with and separates the free fatty acids from the refined or edible portions of the peanut oil. By that process, the free fatty acids in the crude peanut oil are neutralized and the refined peanut oil rises to the top of the container, and a substance called "foots" or "sludge" settles to the bottom of the container. The "foots" or "sludge" is a product obtained in the refining process and consists of sodium salts of the fatty acids, which fatty acids were originally present in the crude peanut oil, as well as waste materials. The

"foots" or "sludge" is known as "peanut oil soap stock" and is used commercially as a material in the manufacture of soap.

The imported peanut acid oil is obtained from the "foots" or "sludge" by treating the latter with sulfuric acid, during which process the "peanut acid oil" rises to the top of the tank and a water solution of sodium sulfate and impurities contained in the "foots" or "sludge" settle to the bottom of the tank and are discarded.

Counsel for the Government introduced illustrative exhibits Nos. 2, 3, 4, and 5. Illustrative exhibit 2 is a bottle containing crude peanut oil; illustrative exhibit 3 is a bottle containing two layers of material, the top layer being the refined peanut oil and the bottom layer "foots" or "sludge;" illustrative exhibit 4 is a bottle containing the "foots" or "sludge" only; illustrative exhibit 5 is a bottle containing two layers of material, the top layer being "peanut acid oil" and the bottom layer consisting of a water solution of sodium sulfate and other impurities contained in the "foots" or "sludge."

Two questions are presented by counsel for the Government for our consideration, namely; (1) whether the imported peanut acid oil consists of the same free fatty acids which were present in the crude peanut oil and (2) whether the imported peanut acid oil is a non-enumerated raw or unmanufactured article and dutiable at 10 per centum ad valorem under paragraph 1558, *supra*, or whether it is an article manufactured in whole or in part and dutiable at 20 per centum ad valorem under the same paragraph.

The testimony of the Government's witness, Dr. McSorley, differs from that of appellee's witnesses in that he was of opinion that the imported "peanut acid oil" is not precisely the same substance as was present in the original peanut oil.

It is unnecessary that we here discuss all of the chemical aspects of the case presented in the testimony of Dr. McSorley. Although the witness was of opinion from a *theoretical* point of view that one of the hydrogen atoms per molecule of the peanut oil here involved was not the same hydrogen atom originally present in the peanut acid oil contained in the original peanut oil because of the use of sulfuric acid in the refining process, he conceded that it was impossible to identify the hydrogen ions that combined with the acid radicals as a result of the use of sulfuric acid in the refining process. In other words, Dr. McSorley was of opinion that although the imported product was the equivalent in all respects to the *peanut acid oil* which was present in the *crude peanut oil*, nevertheless, the use of the sulfuric acid in the refining process caused, *at least theoretically*, the substitution of the sulfuric hydrogen atom per molecule for the hydrogen atom per molecule present in the original peanut acid oil. Dr. McSorley may be entirely right, and authorities are cited in the brief of counsel for the Government which, it is claimed, support his views. However, we deem it

unnecessary to decide that issue because we are of opinion, for reasons hereinafter stated, that the involved peanut acid oil is not a raw or unmanufactured article, but rather is a nonenumerated article manufactured, in whole or in part, and dutiable as such under paragraph 1558, *supra*.

It will be recalled that the crude peanut oil was subjected to a water solution of alkali, such as sodium hydroxide; that the sodium hydroxide combined with the free fatty acids which existed as impurities in the crude peanut oil and separated them from the refined or edible portions of the peanut oil; that as a result of that process, two products were produced, the refined or edible portion of the peanut oil and a substance known as "foots" or "sludge" which consists of sodium salts of the fatty acids, which fatty acids were originally present as impurities in the crude peanut oil, and waste materials; that the "foots" or "sludge" is known as "peanut oil soap stock" and is used commercially as a raw material in the manufacture of soap; and that in order to obtain the imported product, the "foots" or "sludge" is treated with sulfuric acid as a result of which process the peanut acid oil here involved is produced.

It is immaterial, so far as the issue under consideration is concerned, whether the process of subjecting the crude peanut oil to sodium hydroxide is a manufacturing process. By subjecting the "foots" or "sludge" to a chemical process, that is, treating it with sulfuric acid, the involved product—peanut acid oil—is obtained by separating it from the sodium sulfate and other materials contained in the "foots" or "sludge."

We think it is clear that the process to which the "foots" or "sludge" is subjected is not a mere process of cleansing *peanut acid oil* in order to get it by itself, within the purview of the rule announced in *United States* v. *Salomon*, 1 Ct. Cust. Appls. 246, T. D. 31277; *United States* v. *Brown & Co. et al.*, 10 Ct. Cust. Appls. 47, T. D. 38295; *United States* v. *Stone & Downer*, 12 Ct. Cust. Appls. 293, T. D. 40296; *United States* v. *W. S. Makaroff et al.*, 16 Ct. Cust. Appls. 531, T. D. 43263; *Passaic Worsted Co. et al.* v. *United States*, 17 C. C. P. A. (Customs) 459, T. D. 43916.

Peanut acid oil, *per se*, was not present in the "foots" or "sludge." It was obtained from the "foots" or "sludge" by converting the sodium salts of the fatty acids into peanut acid oil. See *Edward Jefferson (Inc.)* v. *United States*, 18 C. C. P. A. (Customs) 322, T. D. 44583.

The imported product is used as a material in the manufacture of soap and is also, to some extent, combined with alcohol to make an ester which has commercial uses.

We are of opinion that the issue here is controlled by our decisions in the cases of *American Smelting & Refining Co.* v. *United States*,

12 Ct. Cust. Appls. 212, T. D. 40226; *American Smelting & Refining Co.* v. *United States*, 16 Ct. Cust. Appls. 46, T. D. 42718; *United States* v. *Half Moon Manufacturing & Trading Co.*, 24 C. C. P. A. (Customs) 232, T. D. 48668.

The first *American Smelting & Refining Co.* case, *supra*, involved arsenical flue dust, a fine powder containing arsenious acid, produced in "lead smelting operations, in which ores containing lead, silver, gold, and sometimes copper, are smelted in a lead blast furnace."

It appears from the decision in that case that during the smelting operations gases carrying dust and smoke were blown into the flues and the gases were forced into a building having a perforated floor. At each perforation in the floor a bag was attached into which the solid particles of the flue dust were retained in the form of a fine powder. The flue dust contained a high percentage of arsenious acid. We there held that the imported flue dust was a byproduct which was produced by elaborate manufacturing processes because of its value as an article of commerce; and that the byproduct thus obtained was not a nonenumerated raw or unmanufactured article under paragraph 385 of the tariff act of 1913, but was dutiable as a nonenumerated manufactured article under that paragraph.

In the second *American Smelting & Refining Co.* case, *supra*, we again held that flue dust produced in substantially the same manner as that involved in the first *American Smelting & Refining Co.* case, *supra*, although containing somewhat different constituents, was dutiable as a nonenumerated manufactured article at 20 per centum ad valorem under paragraph 1458 of the Tariff Act of 1922.

In the case of *United States* v. *Half Moon Manufacturing & Trading Co.*, *supra*, we held that certain gluten or "vegetable albumen" produced from wheat flour as a byproduct in the manufacture of starch was dutiable as a nonenumerated manufactured article at 20 per centum ad valorem under paragraph 1558 of the Tariff Act of 1930. In so holding, we stated that the principles announced by the court in the *American Smelting & Refining Co.* cases, *supra*, were controlling of the issue there presented.

The question of similitude was not raised by counsel for the respective parties, either in the trial court or in this court, and no dutiable paragraph covering merchandise similar to that here involved has been called to our attention and we have found none. Furthermore, it has not been established by the evidence of record that the involved merchandise is dutiable by similitude to any article enumerated in the Tariff Act of 1930.

For the reasons hereinbefore stated, we are of opinion that the involved merchandise is not dutiable, as held by the trial court, as a nonenumerated *raw or unmanufactured article* at 10 per centum ad valorem under paragraph 1558, *supra*, but is dutiable as a non-

enumerated *article manufactured*, in whole or in part, at 20 per centum ad valorem under that paragraph, as held by the collector.

The judgment of the trial court is, accordingly, *reversed*.

By reason of illness, GARRETT, Presiding Judge, was not present at the argument of this case and did not participate in the decision.