(C.D. 3988)

Luria Bros. & Company *v.* United States

United States Customs Court, Third Division

(Decided April 2, 1970)

*Schwartz & Lidstrom* (*Barnes, Richardson & Colburn* and *Joseph Schwartz* of counsel) for the plaintiff.

*William D. Ruckelshaus*, Assistant Attorney General (*Bernard J. Babb* and *Robert Blanc*, trial attorneys), for the defendant.

Before RICHARDSON and LANDIS, Judges

LANDIS, Judge: These two protests, consolidated for trial, are actions to recover duties assessed on six shipments of metal material, which were imported from Canada between December 1963 and June 1965. Plaintiff claims the metal material should be free of duty under TSUS item 911.12, whereas customs classified it as dutiable at 20 cents per ton under TSUS item 607.15.

The material was invoiced as "in bulk, iron skulls", "In Bulk, Iron Skulls, chips and pigs mixture", "Iron Skulls, in bulk", and "Mixtures of Pigs, Skulls and Iron chips". Not in controversy is the duty assessed on certain in bulk pig iron invoiced as "Sorelmetal A–1", included in some of the shipments, in view of the statement of plaintiff's counsel at the opening of trial. (R. 2.)

Customs at Chicago uniformly assessed all the invoiced shipments at 20 cents per ton under TSUS (Tariff Schedules of the United States) item 607.15, which provides as follows:

> Pig iron, cast iron, and spiegeleisen, all the foregoing in pigs, blocks, lumps, and similar forms:
>
> Pig iron and cast iron:

| | | |
|---|---|---|
| 607.15 | Not containing chromium, molybdenum, tungsten, or vanadium in amounts specified in headnote 4 of this subpart_____ | 20¢ per ton |

Plaintiff claims that the invoiced items, except for the so-called "Sorelmetal A–1", should have been classified free of duty under TSUS item 911.12 [1] (Appendix to the Tariff Schedules, Part 1, Subpart B), which provides as follows:

PART 1.—TEMPORARY LEGISLATION

\*     \*     \*     \*     \*     \*     \*

Subpart B. – Temporary Provisions Amending the Tariff Schedules

> Subpart B headnotes:
> 1. Any article described in the provisions of this subpart, if entered during the

---

[1] This item represents temporary legislation amending the tariff schedules to accord more favorable treatment than accorded under the permanent tariff provisions, i.e. classification of "iron or steel waste and scrap", TSUS items 607.10 through 607.12. The temporary legislation originated in Public Law 869, September 30, 1950, 64 Stat. 1093.

period specified in the last column, is subject to duty at the rate set forth herein in lieu of the rate provided therefor in schedules 1 to 8, inclusive.

\*    \*    \*    \*    \*    \*    \*

Metal waste and scrap (provided for in part 2, schedule 6), except lead, zinc, and tungsten waste and scrap; unwrought metal (except copper, lead, zinc, and tungsten) in the form of pigs, ingots, or billets (a) which are defective or damaged, or have been produced from melted down metal waste and scrap for convenience in handling and transportation without sweetening, alloying, fluxing, or deliberate purifying, and (b) which cannot be commerically used without remanufacture; relaying or rerolling rails; and articles of metal (except articles of lead, of zinc, or of tungsten, and not including metal-bearing materials provided for in schedule 4 or in part 1 of schedule 6 and not including unwrought metal provided for in part 2 of schedule 6) to be used in remanufacture by melting:

\*    \*    \*    \*    \*    \*    \*

911.12                              Other _____ Free

The issue is whether these iron skulls and mixtures of skulls, chips, and pigs fit into any of the three categories of metal, to wit, (1) metal waste or scrap, (2) unwrought metal of the prescribed form and condition, (3) articles of metal to be used in remanufacture by melting, free of duty under TSUS item 911.12. Plaintiff, relying on the final or third category more so than the others, contends, nevertheless, that the iron skulls and mixtures of skulls, chips, and pigs respond to all three categories of metal described in TSUS 911.12. On this record, we are led to the opposite conclusion and overrule the protests.

The record consists of the official papers transmitted to the court with these protests, received in evidence (R. 3), and the testimony of three witnesses for the plaintiff. There is no dispute as to the qualifications of the witnesses to testify, or the facts established by their testimony. The witnesses are best associated with the fact that the iron skulls and mixtures of iron skulls, chips, and pigs are a product of the Quebec Iron & Titanium Corporation, Sorel Quebec, Canada,

sold to Luria Bros. & Company, Inc., Cleveland, Ohio, which in turn sold the skulls and mixtures to Keystone Steel & Wire Company, Peoria, Illinois, manufacturers of steel, wire, and wire products.

Mr. Richard Burlingame, chief metallurgist for Luria Bros. & Company, Inc., testified that he had visited Quebec Iron & Titanium Corporation in Canada. From what he observed at their plant, he was able to testify as to how Quebec Iron produced the skulls and mixtures as by-products of "two prime saleable materials", titanium slag and pig iron. (R. 8.) Mr. Robert J. Joyce, account executive with Luria Bros. & Company, stated that the business of his firm is buying and selling scrap iron. He saw the imported iron skulls and mixtures in the condition imported and described their condition for the record. Mr. J. Benedict Kopec, director of metallurgy and quality control for Keystone Steel & Wire Company, testified how his company used the iron skulls and mixtures in their steel operation. We can here summarize the relevant testimony.

The iron skulls are obtained in the process of reducing ilmenite concentrates, an iron titanium oxide, to a molten mass in an electric furnace. This mass is tapped from the furnace into a ladle in which the molten mass is desulphurized and allowed to cool. After it is cooled, the molten mass is either poured out of the ladle into a catch basin to be run through a pigging process, or the molten mass may be additionally carbonized in the ladle, allowed to cool, and then poured off into the catch basin for the pigging process.

Iron skulls are that part of the molten mass which, as it cools in the ladle, solidifies on the bottom and sides of the ladle. As the ladle is used over and over again, a skull of solidified material builds up and is eventually removed by "knocking" it out of the ladle.

The skulls in the mixture of iron skulls, chips, and pigs, are pieces of iron skull broken up and screened into different sizes; the chips are one of those sizes, and the pigs "maybe defective by virtue of undersize, fragments of pigs, they may contain blow holes or other physical defects, or they may be off-grade in terms of their chemical composition and therefore are put into this category [mixtures]." (R. 12.)

Pigging is a machine process in which a continuous chain of molds moves slowly under the catch basin holding the molten mass. The molds are filled in a controlled fashion. At the end of the operation, the molten mass drops out of the mold as a solid pig and the mold recycles. A solid pig is usually in block form. Some pig forms are rejected if not considered premium material.

A solid pig in block form is virtually a 100 percent solid metallic alloy of iron. The iron skulls and mixtures invariably have refractory

materials, slag, and dirt trapped in them but minimally are 92 percent to 95 percent metallic iron. Both, the solid pig in block form and the iron skulls and mixtures, have no use other than to be remelted to make iron or steel. Keystone Steel & Wire Company used the iron skulls and mixtures as a portion of their charge material in an open hearth furnace to be melted along with other pig iron to be processed into steel and poured into an ingot form or made into other products.

None of the witnesses considered the iron skulls and mixtures of iron skulls, chips, and pigs to be in shape, form, or analysis of alloy elements, a primary form of metal. The opinion evidence is that a primary form of metal is generally a simple geometric shape which can be reheated and shaped by rolling or forging or other hot forming techniques.

In the condition imported, the iron skulls and mixtures ranged from "fines", described as a "salt type appearance", to lumps and chunks anywhere from "two inches to four inches, to pieces that would be approximately two to three tons, size-wise approximately the size of the table, or pieces the size of the chair." (R. 28.) This brings us to discuss seriatim, in the order relied on by plaintiff, the three categories of metal, free of duty under TSUS item 911.12.

I *Articles of metal (\* \* \* not including unwrought metal provided for in part 2 of schedule 6) to be used in remanufacture by melting.*

Whether or not the iron skulls, and the fines, lumps and chunks of iron skulls and mixtures might be considered "articles of metal" in the broad sense, it seems clear to us that under authority of *United Metal Goods Mfg. Company* v. *United States*, 46 CCPA 120, C.A.D. 712 (1959), they are not articles used in remanufacture by melting. These iron skulls and mixtures are even less advanced than the zinc-aluminum ingots which the court of appeals said were not articles used in "remanufacture by melting" under Public Law 869,[2] because:

> \* \* \* A material to be remanufactured must necessarily have previously been manufactured. \* \* \* an article which is to be remanufactured does not encompass intermediate forms assumed during processes of manufacture, but rather embraces articles manufactured for a particular end use and subsequently imported into this country to be melted and remanufactured into other articles. In our opinion it does not include alloys made to definite specifications abroad in the form of ingots and imported into this country, such as the instant importations to be formed into particular consumer articles. [46 CCPA 123.]

This disposes of plaintiff's first contention.

---

[2] See footnote 1.

We further observe that the law controlling free entry under TSUS item 911.12 also provides that the articles of metal to be used in remanufacture by melting do not include unwrought metal provided for in part 2 of schedule 6. We are of the opinion that the disputed metal material in this litigation is "unwrought metal". For the purposes of part 2, schedule 6, the law provides that the term "unwrought", when it is used in part 2:

> * * * refers to metal, whether or not refined, in the form of ingots, blocks, lumps, billets, cakes, slabs, pigs, cathodes, anodes, briquettes, cubes, sticks, grains, sponge, pellets, shot, and similar primary forms, but does not cover rolled, forged, drawn, or extruded products, tubular products, or cast or sintered forms which have been machined or processed otherwise than by simple trimming, scalping, or descaling; [TSUS, schedule 6, part 2, headnote 3(a)].

We agree with plaintiff's point that the phrase "and similar primary forms", in the above quote, obviously means that the forms preceding the phrase must likewise be "primary forms". (Plaintiff's brief, page 11.) But we do not so readily accept that the phrase narrowly refers to metal which is fabricated to a more advanced state ready to be formed into finished products as understood and testified to by plaintiff's witnesses. *United States* v. *C. J. Tower & Sons*, 44 CCPA 1, C.A.D. 626 (1956). Before reading that limitation into the phrase, we should at least like to know how metal in the form of "lumps" (one of the described forms of unwrought metal) is advanced in state, ready to be formed into a finished product. Besides, plaintiff's own testimony is that pigs (also a described form of unwrought metal) have no other use than to be remelted. We are thus led to the opinion that the forms to which the term "unwrought" refers are all initial or relatively primitive forms, and that in the phrase "similar primary forms", the word "primary" means first in order of time or development, Webster's Third New International Dictionary, 1968 edition, which is the sense of the customs classification as pig iron in lumps and similar forms under TSUS item 607.15.

II *Unwrought metal in the form of pigs, ingots, or billets (a) which are defective or damaged, or have been produced from melted down metal waste and scrap for convenience in handling and transportation without sweetening, alloying, fluxing, or deliberate purifying and (b) which cannot be commercially used without remanufacture.*

While, as we have discussed above, the disputed item merchandise is unwrought metal, it is not shown to be in the form of pigs, ingots, or billets. Even if the disputed items were in one of those forms, there is nothing to establish that they meet the condition for free entry of

those forms under TSUS item 911.12 as claimed. Plaintiff suppositions, in a single paragraph, that the metal material meets the conditions for free entry under this clause. This record simply does not support that claim.

III *Metal waste and scrap (provided for in part 2, schedule 6).*

Here again for the purposes of part 2, schedule 6, the law provides that the term "waste and scrap":

> * * * refers to materials and articles of metal which are second-hand or waste or refuse, or are obsolete, defective or damaged. and which are fit only for the recovery of the metal content or for use in the manufacture of chemicals, and does not include metal in unwrought form or metal-bearing materials provided for in part 1 of this schedule; [TSUS, schedule 6, part 2, headnote 3(b)].

Consistent with our finding that the disputed materials are a form of "unwrought metal", we must hold that the materials are not the kind of "waste and scrap" referred to in the law. Plaintiff, we would note, has also failed to show us the provision in part 2, schedule 6, under which the disputed materials would be classifiable as "waste and scrap". If, as we presume, the disputed materials are claimed to be "*iron* or *steel* waste or scrap" [emphasis added] provided for in part 2, schedule 6, TSUS item 607.11, there is again, no proof the material is waste or scrap of iron or steel.

Some of the witnesses and laboratory reports with the official papers considered the mixtures "scrap" but this is not proof that, for tariff purposes, it is scrap. Scrap carries the same connotation as waste and:

> * * * Waste ordinarily implies superfluous, useless, or rejected material, something left over, as the refuse of cotton manufacture. Let it not be understood that we mean to hold that Congress has used the word waste in the tariff act as meaning that which has no value—worthless remnants—but that waste is something which is, generally speaking, left over in the treatment of the material, once obtained, as contradistinguished from the treatment to obtain the material itself. * * * [*United States* v. *Salomon*, 1 Ct. Cust. Appls. 246, 250, 251, T.D. 31277 (1911).]

See also, *United States* v. *Williams Clarke Co., a/c American Agar and Chemical Co.*, 50 CCPA 67, C.A.D. 822 (1963); *Chicago Mica Co. et al.* v. *United States*, 21 CCPA 401, T.D. 46927 (1934); *Mawer-Gulden-Annis (Inc.)* v. *United States*, 17 CCPA 270, T.D. 43689 (1929).

Recognizing that the tariff schedule definitions of "unwrought" and "waste and scrap" sought to introduce important distinctions as to the forms and condition of metals classified in part 2, schedule 6,[3] we are

---

[3] Tariff Classification Study, Schedule 6, page 88.

inclined to preserve those distinctions on this record, where the argument in support of the free entry claim fails to address itself to or explore the depth of those distinctions. The protests are overruled.

Judgment will be entered accordingly.

(C.D. 3989)

